***FLORIO PERRUCCI STEINHARDT & CAPPELLI LLC***
Robert M. Donchez, Esquire
Attorney I.D. No. 209505
Sarah K. Powell, Esquire
Attorney I.D. No. 320055
60 West Broad Street, Suite 102
Bethlehem, PA 18018
610-691-7900 (telephone)
610-691-0841 (telefax)
rdonchez@floriolaw.com (email)
spowell@floriolaw.com (email)
Attorneys for Plaintiff,
Getting Grace Film, LLC a/k/a Getting Grace, LLC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GETTING GRACE FILM, LLC a/k/a GETTING GRACE, LLC<br>3388 Courtney Drive<br>Center Valley, PA 18034 | : | CIVIL ACTION |
| Plaintiff, | : | No.: 5:19-cv-01607-JLS |
| | : | |
| vs. | : | |
| | : | |
| HANNOVER HOUSE, INC.<br>300 N. College Avenue, Suite 311<br>Fayetteville, AR 72701<br>And<br>MEDALLION RELEASING, INC.<br>300 N. College Avenue, Suite 311<br>Fayetteville, AR 72701<br>and<br>ERIC F. PARKINSON<br>335 W Holly St<br>Fayetteville, AR 72703 and/or<br>300 N. College Avenue, Suite 311<br>Fayetteville, AR 72701<br>and<br>D. FREDERICK SHEFTE<br>3741 N. Old Wire Rd<br>Fayetteville, AR 72703 and/or<br>1102 Schmieding Ln<br>Springdale, AR 72764 and/or<br>300 N. College Avenue, Suite 311 | : | JURY TRIAL DEMANDED |

1

| | |
|---|---|
| Fayetteville, AR 72701 | : |
| and | : |
| TOM SIMS | : |
| 7 Bluestem Lane | : |
| Bentonville, AR 72712 | : |
| and | : |
| BOBBY S. SARGENT | : |
| 8012 Chervil Dr | : |
| Austin, TX 78759-8918 | : |
| | : |
| Defendants. | : |

## FIRST AMENDED COMPLAINT[1]

AND NOW comes the Plaintiff, Getting Grace Film, LLC a/k/a Getting Grace, LLC, ("Getting Grace" or "Plaintiff")[2] by and through its attorneys, Florio Perrucci Steinhardt and Cappelli LLC, and files the within First Amended Complaint against the above-named Defendants, and in support thereof avers as follows:

1.  Plaintiff Getting Grace is a limited liability company incorporated in the Commonwealth of Pennsylvania with a principal place of business at 3388 Courtney Drive Center Valley, PA 18034.

2.  One of Getting Grace's members, James Andrews, is a resident and citizen of the State of Texas.[3]

3.  Defendant Hannover House, Inc. ("Hannover") is a corporation incorporated in the state of Arkansas and/or Wyoming with a principal place of business at 300 N. College Ave., Suite 311,

---

[1] Plaintiff is contemporaneously herewith filing a Motion to Remand to the Court of Common Pleas of Northampton County, Pennsylvania.  This Amended Complaint is filed without prejudice to Plaintiff's Motion to Remand and shall not be construed as a waiver of any rights or remedies of Plaintiff or as Plaintiff's consent to federal jurisdiction.

[2] Although the Distribution Agreement and Promissory Notes referenced in Plaintiff's First Amended Complaint refer to Getting Grace, LLC as the authorized owner and/or copyright proprietor and licensing source for the original, feature film, inspirational drama entitled "GETTING GRACE" starring Daniel Roebuck, Madelyn Dundon, Dana Ashbrook and Marsha Dietlein and produced by Daniel Roebuck, the proper name of the entity is Getting Grace Film, LLC.

[3] Upon information and belief, Plaintiff has members who are citizens of multiple states across the United States, including, but not limited to California, as well as Texas and Pennsylvania.

Fayetteville, AR 72701, a registered agent address of 1621 Central Ave Cheyenne, WY 82001, and which regularly conducts business in the Commonwealth of Pennsylvania.

4.      Defendant Medallion Releasing, Inc. ("Medallion") is a corporation incorporated in the state of Arkansas with a principal place of business at 300 N. College Ave., Suite 311, Fayetteville, AR 72701, a registered agent's address of 1428 Chester Street Springdale, AR 72764, and which regularly conducts business in the Commonwealth of Pennsylvania.

5.      Defendant Eric F. Parkinson ("Parkinson") is an adult individual residing at 335 W Holly St Fayetteville, AR 72703 and/or 300 N. College Avenue, Suite 311 Fayetteville, AR 72701 and was the Incorporator, Organizer, President and/or Secretary for Hannover House, Inc. and the Vice President for Medallion Releasing, Inc. for all times relevant to this lawsuit.

6.      Defendant D. Frederick Shefte ("Schefte") is an adult individual residing at 3741 N. Old Wire Rd Fayetteville, AR 72703 and/or 1102 Schmieding Ln Springdale, AR 72764 and/or 300 N. College Avenue, Suite 311 Fayetteville, AR 72701 and was the President, Chief Operating Officer and/or Financial Operator for Hannover House, Inc. and the Secretary for Medallion Releasing, Inc. for all times relevant to this lawsuit.

7.      Defendant Tom Sims ("Sims") is an adult individual residing at 7 Bluestem Lane Bentonville, AR 72712 and was the Vice President of Sales for Hannover House, Inc. and the President and/or Incorporator/Organizer for Medallion Releasing, Inc. for all times relevant to this lawsuit.

8.      Defendant Bobby S. Sargent ("Sargent") is an adult individual residing at 8012 Chervil Drive Austin, TX 7859-8918 and was the Treasurer for Hannover House, Inc. for all times relevant to this lawsuit.

9.      At all times relevant to the instant lawsuit, Defendants Parkinson, Schefte, Sims and Sargent were acting as individuals and as principals, representatives, owners and/or agents of Defendants Hannover and/or Medallion.

10.      Getting Grace is the authorized owner and/or copyright proprietor and licensing source for the original, feature film, inspirational drama entitled "GETTING GRACE," a picture filmed in Pennsylvania and based in Pennsylvania, starring Daniel Roebuck, Madelyn Dundon, Dana Ashbrook and Marsha Dietlein and was produced by Daniel Roebuck (the "Picture").

11.      On December 18, 2017, Plaintiff entered into a Worldwide Distribution Agreement ("Agreement") with all of the aforementioned Defendants to this lawsuit, whether individually or as a principal, representative, owner and/or agent of the other Defendant(s).  A true and correct copy of the Agreement is attached hereto as **Exhibit A**.

12.      Erik Parkinson, executed the Agreement as C.E.O. for Hannover House, Inc. and Medallion Releasing, Inc.

13.      Pursuant to the Agreement, Hannover and Medallion (collectively, "Distributor") were to serve as the distributors of the Picture for a nationwide theatrical engagement.

14.      As part of Distributor's representation of the Picture in the nationwide theatrical engagement, Defendants engaged numerous theaters in Pennsylvania, including, but not limited to, AMC theater in the Lehigh Valley, Pennsylvania, the Roxy theater in the Lehigh Valley, Pennsylvania, multiple theaters in State College, Pennsylvania.

15.      This was not the first occasion where Distributor had worked on a film that was filmed in and distributed in Pennsylvania; pursuant to Distributor's own website, Distributor engaged in production activities on Primate, was planned for a Summer 2015 shoot in

Pennsylvania.   <u>See</u>   "Update   on   HHSE   Productions"   (March   3,   2015) https://hannoverhousemovies.blogspot.com/2015/03/update-on-hhse-productions.html .

16.     Distributor was further obligated under the Agreement to enter into a contract with Sony Pictures Home Entertainment ("<u>SPHE</u>") for releasing the Picture on to physical home video devises for resale, for sales to retailers, online-seller, and other appropriate outlets in the United States and Canada, as well as for television and Video-On-Demand.

17.     Distributor and Getting Grace further agreed, pursuant to the Agreement, to agree upon a preliminary theatrical release and marketing plan and budget for the release of the Picture by December 30, 2017 and, accordingly, the parties attached several Exhibits which summarized the theatrical launch plans then anticipated by the Distributor.

18.     In <u>Exhibit A</u> to the Agreement, Getting Grace agreed to provide a bus tour using additional Publicity and Advertising ("<u>P&A</u>") monies pursuant to a separate budget to be reserved by and directed by Getting Grace, in the base amount of Fifty Thousand Dollars ($50,000.00).

19.     In <u>Exhibit B</u> to the Agreement, Getting Grace agreed to provide one hundred and fifty-thousand dollars ($150,000.00) to Distributor for the release of the Picture to targeted markets.

20.     <u>Section 11</u> of the Agreement further stated that the Distributor was obligated to pay to Getting Grace Two Hundred and Fifty Thousand Dollars ($250,000.00) as a Minimum Guarantee for the USA & Canada market, as well as two hundred thousand dollars ($200,000.00) as a Minimum Guarantee for the International market, following full delivery of the Picture and advance payment by Getting Grace to Distributor of the total of the aforementioned amounts ($450,000.00).

21.     Said Minimum Guarantees described in Paragraph 15, above, were to be paid to Getting Grace against its Net Revenues and were to be paid on or before twelve (12) months (or at the latest December 30, 2018) following full delivery of the Picture and rendered regardless of whether or not the total of Getting Grace's Net Revenues met the sums of the payments.

22.     Exhibit G and Exhibit G-1 to the Agreement are Promissory Notes for the payments described in Paragraphs 18 through 21 above.

23.     Erik Parkinson, executed the Promissory Notes as C.E.O. for Hannover House, Inc. and Medallion Releasing, Inc.

24.     Specifically, Exhibit G to the Agreement is Promissory Note issued by Distributor, as borrower, to Getting Grace, as creditor, with a principal of two hundred thousand dollars ($200,000.00) for the distribution of the Picture by Distributor pursuant to the Agreement ("P&A Note").

25. The P&A Note stated that Getting Grace would pay Distributor as follows:

| | |
|---|---|
| Within five (5) business days of execution of P&A Note or December 18, 2017, which ever occurred first: | $50,000.00 |
| On or before Jan. 31, 2018: | $50,000.00 |
| On or before March 1, 2018: | $50,000.00 |
| Additional sum directly to Getting Grace vendors: | $50,000.00 |

26.     In accordance with the Agreement, Getting Grace made full payment to Defendants in the amount of Two Hundred Thousand Dollars ($200,000.00) to cover P&A costs.

27.     The P&A Note had a maturation date and was to be paid in full on or before December 30, 2018, including principal, all accrued interest at a rate of seven percent (7%) per

annum, and the applicable Investment Advisory Fee ("IAF") of sixteen thousand dollars ($16,000.00).

28.     Getting Grace filed and recorded a U.C.C. Security Interest in of all the revenues to be derived from the distribution of the Picture by Distributors, as authorized by the Agreement and permitted by Article 9 of the Uniform Commercial Code.

29.     Pursuant to the P&A Note, such Security Interest would survive until such time that the principal, applicable interest and IAF were fully and indefeasibly paid to Getting Grace.

30.     Accordingly, Distributor was required, pursuant to the P&A Note, to instruct all licensors, sub licensors, customers, purchasers, exhibitors and distributors of the Picture to designate all revenue payments to a specifically designated and segregated bank account ("Collections Account") for the benefit of Getting Grace.

31.     The P&A Note further provided that Distributor would pay all of Getting Grace's reasonable expenses incurred to enforce or collect any of the obligations under the P&A Note, including, without limitation, reasonable attorneys' fees and expenses, whether incurred without commencement of a suit, in any trial, arbitration, or administrative proceeding, or in any appellate or bankruptcy proceeding.

32.     Likewise, Exhibit G-1 to the Agreement is a Promissory Note issued by Distributor, as borrower, to Getting Grace, as creditor, in the amount of Four Hundred Fifty Thousand Dollars ($450,000.00) as the Minimum Guarantee being promised in exchange for the rights to distribute by the Distributor pursuant to the Agreement ("Minimum Guarantee Note").

33.     The Minimum Guarantee Note stated that Distributor would pay Getting Grace Four Hundred Fifty Thousand Dollars ($450,000.00), which had been paid in the production of

the Picture, representing the combined Minimum Guarantee payment from Distributor to Getting Grace.

34.     The Minimum Guarantee Note had a maturation date and was to be paid in full on or before December 30, 2018, including principal, all accrued interest at a rate of seven percent (7%) per annum.

35.     Getting Grace filed and recorded a U.C.C. Security Interest in all of the revenues to be derived from the distribution of the Picture by Distributor, as authorized by the Agreement and permitted by Article 9 of the Uniform Commercial Code.

36.     Pursuant to the Minimum Guarantee Note, such Security Interest would survive until such time that the principal and applicable interest were fully and indefeasibly paid to Getting Grace.

37.     Accordingly, Distributor was required, pursuant to the Minimum Guarantee Note, to instruct all licensors, sub licensors, customers, purchasers, exhibitors and distributors of the Picture to designate all revenue payments to a specifically designated and segregated bank account ("Collections Account") for the benefit of Getting Grace.

38.     Minimum Guarantee Note further provided that Distributor would pay all of Getting Grace's reasonable expenses incurred to enforce or collect any of the obligations under the Minimum Guarantee Note, including, without limitation, reasonable attorneys' fees and expenses, whether incurred without commencement of a suit, in any trial, arbitration, or administrative proceeding, or in any appellate or bankruptcy proceeding.

39.     Pursuant to Sections 10 and 11 of the P&A Note, failure of Distributor to pay on the note when due, plus a ten (10) calendar day cure period, entitled Getting Grace to provide

written notice to Distributor of the total unpaid principal, accrued interest and IAF immediately due and payable.

40.     Additionally, pursuant to the P&A Note, failure by the Distributor to promptly remit to Getting Grace the amount of a meritorious and uncured demand, including the IAF, entitled Getting Grace to enter a Consent Judgment against the Distributor.

41.     Pursuant to Sections 9 and 10 of the Minimum Guarantee Note, failure of Distributor to pay on the note when due plus a ten (10) calendar day cure period entitled Getting Grace to provide written notice to Distributor of the total unpaid principal and accrued immediately due and payable.

42.     Additionally, pursuant to the Minimum Guarantee Note, failure by the Distributor to promptly remit to Getting Grace the amount of a meritorious and uncured demand, entitled Getting Grace to enter a Consent Judgment against the Distributor.

43.     In addition to the provisions authorizing attorneys' fees and costs of suit in the Promissory Notes, the Agreement itself provides that, "in the event of a dispute or lawsuit arising out of or relating to this Agreement, the prevailing party shall be entitled to recover its costs and expenses of suit, including reasonable attorneys' and experts' fees and actual out of pocket costs."

44.     The P&A Note and the Minimum Guarantee Note had, in the aggregate, initial principal amounts of Six Hundred and Fifty Thousand Dollars ($650,000.00) and were both subject to seven percent (7%) interest per annum.

45.     The P&A Note further required, in addition to repayment of the principal balance with interest, payment of a Sixteen Thousand Dollar ($16,000.00) IAF fee.

46.     On or about October 29, 2018, Daniel Roebuck personally paid, on behalf of Getting Grace, in total, approximately $11,628.50 with his personal credit card for the Picture's

9

DVD replication costs to Signature Media as well as shipment costs to Walmart on behalf of Hannover ("Walmart Payment").

47.     Hannover, via email from Eric Parkinson, agreed to pay Daniel Roebuck back in full from the proceeds that were in process from its Michael Kahn stock venture within approximately one week. See Walmart Payment Email Chain, attached hereto as **Exhibit B**.

48.     On October 29, 2018, Daniel Roebuck confirmed to Parkinson and Schefte that he had personally paid approximately $11,628.50 to Signature media on behalf of Hannover and expected to be paid back in full by November 13, 2018, or thereafter with interest. See **Exhibit B**.

49.     On October 30, 2018, Parkinson responded to Roebuck's October 29, 2018 demand, stating "Understood and agreed… we are closing the corp. finance portion to cover this now…." See **Exhibit B**.

50.     A loan was made to the Getting Grace account in order to pay Roebuck and, therefore, Hannover owes this debt directly to Getting Grace.

51.     On November 29, 2018, Plaintiff, by and through its representatives and/or agents, participated in a conference call with Defendants Parkinson and Schefte, who were acting individually and/or as principals, representatives and/or agents of Distributor.

52.     During the aforementioned conference call, Parkinson stated that he was going get the "rest of the theatrical collected" from the Picture so that he could use that to "retire a portion of the P&A funding."

53.     Both Promissory Notes matured on December 30, 2018.

54.     Having not received the payments due under the Agreement and Promissory Notes, on January 11, 2019, counsel for Getting Grace served Distributor via certified mail, regular mail,

and electronic mail with a Notice of Default pursuant to <u>Section 14</u> of the Agreement, <u>Section 10</u> of the P&A Note and <u>Section 9</u> of the Minimum Guarantee Note.  A true and correct copy of the Notice of Default is attached hereto as **<u>Exhibit C.</u>**

55.     Having still not received the payments due under the Agreement and Promissory Notes, on January 25, 2019 counsel for Getting Grace served Distributor via certified mail, regular mail and electronic mail with another copy of the Notice of Default and alerted Distributor to the fact that counsel had filed UCC liens had been against Hannover and Medallion in accordance with the Agreement and Promissory Notes.  A true and correct copy of the January 25, 2019 letter is attached hereto as **<u>Exhibit D.</u>**

56.     As of the date of the filing of this Complaint, Distributor still has not made payments owed to Getting Grace under the Agreement, Promissory Notes and Walmart Payment.

57.     Plaintiff would not have contracted with individual or company Defendants had Defendants not withheld and/or failed to convey certain material facts about individual and/or company Defendants, which facts would have materially affected Defendants to ability to comply with their obligations under the Distribution Agreement, Promissory Notes and Walmart Payment.

58.     For example, upon information and belief, Defendant Hannover House has failed to make numerous required filings with the Security and Exchange Commission ("SEC").  <u>See</u> SEC Filing Report for Hannover House, Inc., attached hereto as **<u>Exhibit E</u>**.

59.     Upon information and belief, Defendants' own investors have repeatedly accused the company and individual Defendants of the aforementioned fraudulent acts on an online investor blog. <u>See</u> <u>https://investorshub.advfn.com/Hannover-House-Inc-HHSE-5223/</u>.

60.     Upon information and belief, the individual and company Defendants have had numerous lawsuits filed against them in State and Federal Court and have had significant judgments rendered against them.

61.     At no point in the negotiations with Plaintiff related to Getting Grace did Defendants inform Plaintiff that they had numerous lawsuits filed against them and numerous judgments rendered against them.

62.     Furthermore, and as more fully outlined below, Defendants had no intention of ever making full and complete payment under the Agreement, Promissory Notes and/or Walmart Payment, yet repeatedly conveyed that Distributor would confer illusory benefits on Plaintiff in order to induce Plaintiff into contracting with Distributor related to the distribution of the Picture. See December 8, 2017 Email from Daniel Roebuck, attached hereto as **Exhibit F**.

**COUNT I**
**PLAINTIFF VS. ALL DEFENDANTS**
**BREACH OF CONTRACT**

63.     Plaintiff incorporates by reference all prior and subsequent Paragraphs of its Complaint as though the same were set out fully at length herein.

64.     At all times material to this lawsuit, Defendants were acting individually, or as principals, representatives and/or agents for another Defendant or Defendants.

65.     Plaintiff and Defendants entered into a written Agreement on December 18, 2017, pursuant to which Distributor executed two Promissory Notes: the P&A Note dated December 30, 2017 in the amount of Two Hundred Thousand Dollars ($200,000.00) and the Minimum Guarantee Note in the amount of Four Hundred Fifty Thousand Dollars ($450,000.00).

66.     Erik Parkinson, executed the Agreement and the Promissory Notes as C.E.O. for Hannover House, Inc. and Medallion Releasing, Inc.

67.     In total, Getting Grace paid Two Hundred Thousand Dollars ($200,000.00) to Defendants for Publicity and Advertising costs.

68.     On or about October 29, 2018, Getting Grace, through Roebuck, additionally paid the "Walmart Payment" for the Picture's DVD replication costs to Signature Media as well as shipment costs to Walmart on behalf of Hannover, totaling Eleven Thousand Six Hundred Twenty-Eight Dollars and Fifty Cents ($11,628.50).

69.     Hannover, via email from Eric Parkinson, agreed to pay back the Walmart Payment by November 13, 2018, or thereafter with interest.  See **Exhibit B**.

70.     Defendants have breached their obligations under the written Agreement, Promissory Notes and Walmart Payment by failing to make payment pursuant to the Agreement, Promissory Notes and written and oral promises to pay the Walmart Payment.

71.     To date, Defendants have failed to make any payment owed to the Plaintiff pursuant to the Agreement, the Promissory Notes and the Walmart Payment.

72.     As a direct and proximate cause of Defendants' conduct as herein set forth, Plaintiff has incurred damages in excess of Six Hundred Seventy-Seven Thousand Six Hundred Thirty-Eight Dollars and Fifty Cents ($677,638.50) plus seven percent (7%) interest per annum.

73.     The aforementioned breaches were caused solely by the Defendants and in no way was caused by an action or failure to act by Plaintiff.

74.     To the contrary, Plaintiff complied fully with any and all obligations owed to Defendant pursuant to the Agreement, Promissory Notes and Walmart Payment.

**WHEREFORE**, Getting Grace Film, LLC demands judgment in its favor and against Defendants in an amount in excess of arbitration limits with interest, costs, attorneys' fees, punitive damages and such other further relief as the Court deems just and appropriate under the circumstances.

## COUNT II
## PLAINTIFF VS. ALL DEFENDANTS
## UNJUST ENRICHMENT

75.     Plaintiff incorporates by reference all prior and subsequent Paragraphs of its Complaint as though the same were set out fully at length herein.

76.     At all times material to this lawsuit, Defendants were acting individually, or as principals, representatives and/or agents for another Defendant or Defendants.

77.     Plaintiff and Defendants entered into an Agreement on December 18, 2017, pursuant to which Distributor executed two Promissory Notes: the P&A Note dated December 30, 2017 in the amount of Two Hundred Thousand Dollars ($200,000.00) and the Minimum Guarantee Note in the amount of Four Hundred Fifty Thousand Dollars ($450,000.00).

78.     Erik Parkinson, executed the Agreement and Promissory Notes as C.E.O. for Hannover House, Inc. and Medallion Releasing, Inc.

79.     In total, Getting Grace paid Two Hundred Thousand Dollars ($200,000.00) to Defendants for Publicity and Advertising costs.

80.     On or about October 29, 2018, Getting Grace, through Roebuck, additionally paid the "Walmart Payment" for the Picture's DVD replication costs to Signature Media as well as shipment costs to Walmart on behalf of Hannover, totaling Eleven Thousand Six Hundred Twenty-Eight Dollars and Fifty Cents ($11,628.50).

81.     Hannover, via email from Eric Parkinson, agreed to pay back the Walmart Payment by November 13, 2018, or thereafter with interest.  See **Exhibit B**.

82.     Defendants have breached their obligations under the written Agreement, Promissory Notes and Walmart Payment by failing to make payment pursuant to the Agreement, Promissory Notes and written promises to pay the Walmart Payment.

83.     To date, Defendants have failed to make any payment owed to the Plaintiff pursuant to the Agreement, the Promissory Notes and the Walmart Payment.

84.     As a direct and proximate cause of Defendants' conduct as herein set forth, Plaintiff has incurred damages in excess of Six Hundred Seventy-Seven Thousand Six Hundred Thirty-Eight Dollars and Fifty Cents ($677,638.50) plus seven percent (7%) interest per annum.

85.     The aforementioned breaches were caused solely by the Defendants and in no way was caused by an action or failure to act by Plaintiff.

86.     To the contrary, Plaintiff complied fully with any and all obligations owed to Defendant pursuant to the Agreement, Promissory Notes and Walmart Payment.

87.     Defendants appreciated the benefits of Plaintiff's payments pursuant to the Agreement and Promissory Notes and accepted such payments even though intending not to fulfill their obligations under the Agreement, Promissory Notes and Walmart Payment.

88.     As such, Defendants were unjustly enriched through no fault of the Plaintiff and only through the wrongful and/or fraudulent acts and omissions of Defendants' failure to perform their obligations pursuant to the Agreement, Promissory Notes and Walmart Payment.

**WHEREFORE**, Getting Grace Film, LLC demands judgment in its favor and against Defendants in an amount in excess of arbitration limits with interest, costs, attorneys' fees, punitive damages and such other further relief as the Court deems just and appropriate under the circumstances.

**COUNT III**
**PLAINTIFF VS. ALL DEFENDANTS**
**VIOLATION OF THE PENNSYLVANIA SECURITIES ACT OF 1972**

89.     Plaintiff incorporates by reference all prior and subsequent Paragraphs of its Complaint as though the same were set out fully at length herein.

90.    At all times material to this lawsuit, Defendants were acting individually, or as principals, representatives and/or agents for another Defendant or Defendants.

91.    The Pennsylvania Securities Act , 70 P.S. § 1-401 ("PSA") makes it unlawful for any person, in connection with the offer, sale or purchase of any security in this State, directly or indirectly, to: (a) employ any device, scheme or artifice to defraud; (b) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; and (c) engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

92.    Defendants secured Agreement-authorized Promissory Notes from Plaintiff, which were executed by Defendants on December 30, 2017, for the total amount of $650,000.00.

93.    In total, Getting Grace paid Two Hundred Thousand Dollars ($200,000.00) to Hannover House for Publicity and Advertising costs, making the total owed under the Agreement and Promissory Notes $666,000.00, inclusive of the IAF owed pursuant to the P&A note.

94.    Representatives of Getting Grace participated in all discussions with Distributor and/or its individual principals related to the distribution of the Picture while located in the Commonwealth of Pennsylvania.

95.    The Promissory Notes were issued to Getting Grace, as the holder of the Note, in the Commonwealth of Pennsylvania.

96.    Eric Parkinson, executed the Agreement and Promissory Notes as C.E.O. for Hannover House, Inc. and Medallion Releasing, Inc.

97.    The Agreement-authorized Promissory Notes were "securities" within the meaning of 70 P.S. § 1-101, et seq.

98.     At the time of purchase of the Promissory Notes, Defendants, individually or as an agent, representative and/or principal of another Defendant or Defendants, falsely stated that they would pay all monies owed to Plaintiff pursuant to the Agreement and Promissory Notes knowing that such statement was false and having no intention on fulfilling their obligations under the Agreement and Promissory Notes.

99.     Defendants false statements were made concerning material facts pursuant to the Agreement and Promissory Notes.

100.    Plaintiff relied on the false statements in the sale of the securities to Defendants.

101.    As a result of Defendants' false statements to Plaintiff, and Plaintiff's reliance thereon, Plaintiff has sustained damages in excess of Six Hundred and Sixty-Six Thousand Dollars ($666,000.00) plus interest, amounting to the full amount of the security purchased.

102.    Parkinson, Schefte, Sims and Sargent, acting as partners, principal executive officer or directors for Distributor at all material times relevant to this lawsuit and materially aided in the act or transaction constituting a violation of the PSA and are, accordingly, jointly and severally liable for the same.

103.    Based on all of the foregoing, Defendants are subject to liability to Plaintiff pursuant to the Pennsylvania Securities Act of 1972, § 70 P.S. § 501 and/or § 503.

**WHEREFORE**, Getting Grace Film, LLC demands judgment in its favor and against Defendants in an amount in excess of arbitration limits with interest, costs, attorneys' fees, punitive damages and such other further relief as the Court deems just and appropriate under the circumstances.

## COUNT IV
## PLAINTIFF VS. ALL DEFENDANTS
## FRAUD/MISREPRESENTATION

104.    Plaintiff incorporates by reference all prior and subsequent Paragraphs of its Complaint as though the same were set out fully at length herein.

105.    At all times material to this lawsuit, Defendants were acting individually, or as principals, representatives and/or agents for another Defendant or Defendants.

106.    Plaintiff and Defendants entered into an agreement on December 18, 2017, pursuant to which Distributor executed two Promissory Notes: the P&A Note dated December 30, 2017 in the amount of Two Hundred Thousand Dollars ($200,000.00) and the Minimum Guarantee Note in the amount of Four Hundred Fifty Thousand Dollars ($450,000.00).

107.    Erik Parkinson, executed the Agreement and Promissory Notes as C.E.O. for Hannover House, Inc. and Medallion Releasing, Inc.

108.    In total, Getting Grace paid Two Hundred Thousand Dollars ($200,000.00) to Hannover Defendants for Publicity and Advertising costs.

109.    On or about October 29, 2018, Getting Grace, through Roebuck, additionally paid the "Walmart Payment" for the Picture's DVD replication costs to Signature Media as well as shipment costs to Walmart on behalf of Hannover, totaling Eleven Thousand Six Hundred Twenty-Eight Dollars and Fifty Cents ($11,628.50).

110.    Hannover, via email from Eric Parkinson, agreed to pay back the Walmart Payment by November 13, 2018, or thereafter with interest.  See **Exhibit B**.

111.    Defendants, individually, or as the agents, representatives and/or principals of another Defendant and/or Defendants, made express and/or implied false representations, in the Agreement and Promissory Notes, Walmart Payment and otherwise, to Plaintiff that they would pay Plaintiff the

amounts owed to Plaintiff pursuant to the Agreement, Promissory Notes and Walmart Payment and preserve Plaintiff's security interest therein.

112.    On or about December 8, 2017, Defendant Parkinson induced Getting Grace to enter the agreement and work with Hannover House, Inc.: (1) that it had negotiated a deal with Sony, which would provide "credibility and stature to the Picture in distribution; (2) that, after thirty-two years, Hannover House has secured the "EXTREMELY VALUABLE" agreement with Sony; and (3) that Hannover House was providing a "VERY VALUABLE service to GETTING GRACE." See **Exhibit F**.

113.    Defendants further made express and/or implied false representations, in the Agreement and Promissory Notes and otherwise, to Plaintiff that they would use the monies loaned pursuant to the Agreement, Promissory Notes and Walmart Payment for their mutual business venture (the Picture) and no other purpose.

114.    The aforementioned false representations made by Defendants were made with the intent to induce Plaintiff to enter into the Agreement, Promissory Notes and Walmart Payment.

115.    It is believed and therefore averred that Defendants never intended on fulfilling their obligations under the Agreement and Promissory Notes and making full payment to Plaintiff according to the terms therein.

116.    It is believed and therefore averred that Defendants never intended on reimbursing Mr. Roebuck for the Walmart Payment.

117.    Upon information and belief, the individual and company Defendants have had numerous lawsuits filed against them in State and Federal Court and have had significant judgments rendered against them.

118.   At no point in the negotiations with Plaintiff related to Getting Grace did Defendants inform Plaintiff that they had numerous lawsuits filed against them and numerous judgments rendered against them.

119.   Said false representations were material to the written agreements between the parties.

120.   Defendants made the aforementioned representations to Plaintiff with actual knowledge of their falsity at the time they were made, or in reckless disregard of their truth or falsity.

121.   Plaintiff, in justifiable reliance upon the aforementioned representations of Defendants, proceeded to enter into the written Agreement, Promissory Notes and Walmart Payment.

122.   Plaintiff would not have entered into the Agreement, Promissory Notes or Walmart Payment with Defendants had Plaintiff known that Defendants' aforementioned representations were false and that Defendants had no intention of ever fulfilling their obligations pursuant to the Agreement and Promissory Notes.

123.   Defendants' conduct, as outlined in this Complaint, was willful, malicious, egregious, outrageous and pursued with wanton disregard of Plaintiff's rights and financial interest.

124.   As a result of Defendants' fraudulent conduct, Plaintiff has suffered substantial and foreseeable monetary losses.

125.   As a direct and proximate cause of Defendants' conduct as herein set forth, Plaintiff has incurred damages in excess of Six Hundred Seventy-Seven Thousand Six Hundred Thirty-Eight Dollars and Fifty Cents ($677,638.50) plus seven percent (7%) interest per annum.

**WHEREFORE**, Getting Grace Film, LLC demands judgment in its favor and against Defendants in an amount in excess of arbitration limits with interest, costs, attorneys' fees, punitive damages and such other further relief as the Court deems just and appropriate under the circumstances.

## COUNT V
## PLAINTIFF V. DEFENDANTS PARKINSON, SCHEFTE, SIMS, AND SARGENT
## PIERCING THE CORPORATE VEIL

126.    Plaintiff incorporates by reference all prior and subsequent Paragraphs of its Complaint as though the same were set out fully at length herein.

127.    That at all relevant times, Defendants Hannover and Medallion were Arkansas and/or Wyoming corporations, specializing in the distribution and sale of theatrical productions, such as the Picture.

128.    That at all relevant times, Defendants Parkinson, Schefte, Sims, and Sargent owned or maintained an interest in Hannover and/or Medallion and conducted and managed its day-to-day operations.

129.    Defendants Parkinson, Schefte, Sims, and Sargent were fully aware of and authorized the conduct undertaken in carrying out the day-to-day operations of Hannover and/or Medallion, including the ongoing and continued evasion of the payments owed to Plaintiff pursuant to the Agreement, Promissory Notes and Walmart Payment.

130.    The Plaintiff reasonably anticipates discovery will show that Defendants Parkinson, Schefte, Sims, and Sargent undercapitalized Hannover and/or Medallion in an effort to defraud the Plaintiff and other creditors.

131.    Defendants Parkinson, Schefte, Sims, and Sargent abused the corporate form of commercial governance to further their personal interests.

132.    Defendants Parkinson, Schefte, Sims, and Sargent used Hannover and/or Medallion to enter into third party contracts with the intent to avoid performance by use of the corporate entity and protections as a shield against personal liability and used the corporate identity as a subterfuge for illegal acts.

21

133.    Defendants Parkinson, Schefte, Sims, and Sargent used Hannover and/or Medallion as a corporate shield to perpetrate a fraud, evade the law and defeat the ends of justice that would require the payments owed to Plaintiff pursuant to the Agreement, Promissory Notes and Walmart Payment.

134.    Injustice will occur if the Plaintiff is not permitted to recover the amount owed to it pursuant to the Agreement, Promissory Notes and Walmart Payment.

135.    The above listed conduct by Defendants Parkinson, Schefte, Sims, and Sargent shows a level of control over Hannover and/or Medallion, such that the corporation(s) was/were a mere instrumentality, or alter ego, of these individual Defendants.

136.    Upon information and belief, Defendant Hannover House has not filed an SEC filing since December 3, 2015, when it is required to file, at a minimum, quarterly 10-Q reports and annual 10-K reports with the SEC.   See **Exhibit E**; see also https://www.sec.gov/cgi-bin/browse-edgar?company=hannover+house&owner=exclude&action=getcompany.

137.    Upon information and belief, there are additional public sources of information evidencing Defendants' fraudulent conduct, disregarded corporate formalities in the operation of Hannover and/or Medallion, undercapitalization of Hannover and/or Medallion and transferred assets from Hannover and/or Medallion to a different company to defraud creditors.

138.    For example, upon information and belief, Defendants' own investors have repeatedly accused the company and individual Defendants of the aforementioned fraudulent acts on an online investor blog.  See https://investorshub.advfn.com/Hannover-House-Inc-HHSE-5223/.

139.    Upon information and belief, the individual and company Defendants have had numerous lawsuits filed against them in State and Federal Court and have had significant judgments rendered against them.

140.    At no point in the negotiations with Plaintiff related to Getting Grace did Defendants inform Plaintiff that they had numerous lawsuits filed against them and numerous judgments rendered against them.

141.    The Plaintiff reasonably anticipates that discovery will reveal additional evidence showing that Defendants Parkinson, Schefte, Sims, and Sargent, disregarded corporate formalities in their operation of Hannover and/or Medallion, failed to maintain adequate corporate records with regard to their operation of Hannover and/or Medallion, undercapitalized Hannover and/or Medallion and transferred assets from Hannover and/or Medallion to a different company to defraud creditors.

142.    Accordingly, it is appropriate to pierce the corporate veil and impose personal liability on Defendants Parkinson, Schefte, Sims, and Sargent.

143.    As a direct and proximate cause of Defendants' conduct as herein set forth, Plaintiff has incurred damages in excess of Six Hundred Seventy-Seven Thousand Six Hundred Thirty-Eight Dollars and Fifty Cents ($677,638.50) plus seven percent (7%) interest per annum.

**WHEREFORE**, Getting Grace Film, LLC demands judgment in its favor and against Defendants in an amount in excess of arbitration limits with interest, costs, attorneys' fees, punitive damages and such other further relief as the Court deems just and appropriate under the circumstances.

### COUNT VI
### PLAINTIFF VS. ALL DEFENDANTS
### DECLARATORY JUDGMENT PURSUANT TO PA. R. CIV. P. 1602

144.    Plaintiff incorporates by reference all prior and subsequent Paragraphs of its Complaint as though the same were set out fully at length herein.

145.    At all times material to this lawsuit, Defendants were acting individually, or as principals, representatives and/or agents for another Defendant or Defendants.

146.    At all times material to this lawsuit, Plaintiff was the authorized owner and/or the copyright proprietor and licensing source for the Picture.

147.    Plaintiff and Defendants entered into a written Agreement on December 18, 2017, pursuant to which Distributor executed two Promissory Notes: the P&A Note dated December 30, 2017 in the amount of Two Hundred Thousand Dollars ($200,000.00) and the Minimum Guarantee Note in the amount of Four Hundred Fifty Thousand Dollars ($450,000.00).

148.    Pursuant to the Agreement, Getting Grace granted Distributor certain rights for the sale, licensing and distribution of the Picture in exchange for Distributor's compliance with its obligations under the Agreement and Promissory Notes.

149.    In total, Getting Grace paid Two Hundred Thousand Dollars ($200,000.00) to Defendants for Publicity and Advertising costs.

150.    Defendants breached their obligations under the written Agreement and Promissory Notes by failing to make payment pursuant to the Agreement and Promissory Notes.

151.    To date, Defendants have failed to make any payment owed to the Plaintiff pursuant to the Agreement and Promissory Notes.

152.    The aforementioned breach was caused solely by the Defendants and in no way was caused by an action or failure to act by Plaintiff.

153.    To the contrary, Plaintiff complied fully with any and all obligations owed to Defendants pursuant to the Agreement and Promissory Notes.

154.    In addition to being liable to Getting Grace for the amounts set forth in this Complaint, the aforementioned breach of contract by Defendants had the effect of forfeiting and terminating Defendants' rights and/or licenses under the Agreement.

155.    As a result of the breach of the Agreement and, in addition to the amounts due and owing to Getting Grace, any and all rights, interest and/or licenses granted to Defendants by Getting Grace under the Agreement with respect to the Picture for its sale, licensing and/or distribution, or otherwise, have terminated.

**WHEREFORE**, Getting Grace Film, LLC demands a declaratory judgment that, due to Defendants breach of the Agreement and Promissory Notes, any and all rights granted to Defendants pursuant to the Agreement with respect to the Picture, have terminated.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues.

Respectfully submitted,

**FLORIO PERRUCCI STEINHARDT & CAPPELLI, LLC**

BY: _____
Robert M. Donchez, Esquire
Sarah K. Powell, Esquire
Attorneys for Plaintiff,
Getting Grace Film, LLC a/k/a Getting Grace, LLC

Dated: May 3, 2019

# EXHIBIT A

## "GETTING GRACE"
### WORLDWIDE DISTRIBUTION AGREEMENT
**(Including by way of a partial transfer of rights to applicable divisions of SONY Pictures Home Entertainment), Covering USA & CANADA Theatrical & "Packaged Goods Home Video", V.O.D., Television and Non-Theatrical Distribution (including Airlines)**

### MEMORANDUM OF AGREEMENT

This Memorandum of Agreement *("Agreement")* is set forth as of December 18, 2017 by and between Hannover House, Inc. and Medallion Releasing, Inc. *(referred to hereunder individually and collectively as "HHSE", or "Sales Agency" or "Distributor")* with Getting Grace, LLC, *(referred to hereunder as "GG" or "Licensor")* for the theatrical distribution, This agreement is specifically contingent upon HHSE executing an agreement with Sony Pictures Home Entertainment ( herein "SPHE") dated on or near Dec. 18, 2017 ( referred to herein "HHSE/SPHE Agreement") as well as packaged-home video, television and video-on-demand digital distribution rights in the Territory as defined below for the original, feature film, inspirational drama entitled "GETTING GRACE" starring Daniel Roebuck, Madelyn Dundon, Dana Ashbrook and Marsha Dietlein, which was produced and directed by Daniel Roebuck *(the "Picture").* The following terms set forth in this Memorandum of Agreement shall govern with the full force and effect of a long-form contract until such time, if ever, that a mutually agreed upon long-form contract encompassing these terms, and any additionally agreed to terms, may be drafted and executed.

1. **FACTS:** This Agreement is made and entered into with reference to the following facts:

a. GG is the authorized owner and / or the copyright proprietors and licensing source *("Licensor")* for the Picture.

b. HHSE *("Sales Agency")* is in the business of distributing and representing films and television programs in all applicable formats and media as set forth herein for, packaged good home video, television and video-on-demand throughout markets in the Territory of the United States of America (including its territories and possessions), and English-speaking provinces of Canada *(the "Territory").* With respect to sales made for territories and media rights outside of North America, it is understood and agreed that HHSE will facilitate as part of this agreement to secure an international sales agreement with Sony International, or an agreed to alternative international sales agency, or major studio distributor, which shall be mutually approved by Sales Agency and GG, and shall be engaged for the sales, licensing and distribution of the Picture ("International Rights"). See item 3a below. The fee for international sales will be 20% and HHSE will not be entitled to any fee for international distribution of Getting Grace, unless negotiated in a separate agreement.



Licensor wishes to engage Sales Agency to represent the Picture for a nationwide theatrical engagement, and at the same time relies on the agreement between SPHE and HHSC indicated above for releasing the Picture on to physical home video devices for resale *(e.g., DVDs, Blu-ray and Ultra HD ideograms)* for sales to retailers, on-line sellers, and other appropriate outlets in the Territory under the Sales Agency terms described hereunder, as well as for Television and Video-On-Demand ("V.O.D."). It is understood and agreed that the theatrical release of the Picture by Sales Agency shall conform to the release requirements as set forth for the Picture to qualify a Netflix Subscription Video-On-Demand license.

**2. PARTIES:**    **LICENSOR:** Getting Grace, LLC
Attn: Daniel Roebuck c/o Michael Trombley
912 South Atherton Street
State College, PA 16801
Tel. ▬▬▬▬▬▬▬▬

**SALES AGENCY:**    Hannover House, Inc.,
Attn: Eric Parkinson, C.E.O.
300 N. College Ave., Suite 311
Fayetteville, AR 72701
(479) 521-5774 / Email: Eric@HannoverHouse.com

**3. DOMESTIC TERRITORY AND MEDIA:**  Except as otherwise defined or limited hereunder, Sales Agency shall act as the exclusive and direct Distributor for theatrical exhibition of the Film and as liaison with SPHE to release in the different ways provided herein for the territory of North America, including the United States, English-speaking provinces of Canada and their respective territories and possessions and protectorates, including embassies and military bases; the entire Caribbean basin, and all United States and Canadian airlines in the languages of English and Spanish. Applicable media shall include theatrical exhibition and non-theatrical public performance *(including film festivals and airlines)* and physical home video devices *(i.e., pre-recorded home videos for private, in-home viewing, including but not limited to DVDs, Blu-Rays and Ultra ideogram units).* Media rights also include all forms of "Video-On-Demand" streaming rights, *(including but not limited to "Subscription" VOD, "Premium" VOD and "Per-Transaction" VOD rights)* except as may be specifically prohibited or otherwise limited by the restrictions as set forth in this agreement or by mutual instrument with respect to non-exclusivity for certain Video-On-Demand outlets. Sales Agency's goal in the release of the Picture is to promptly release the Picture to theatres as quickly as possible, and to structure the release in a manner to maximize the likelihood that the Picture will qualify for a Netflix Subscription Video-On-Demand agreement. HHSE agrees to coordinate theatrical screen selections with Daniel Roebuck to maximize promotion and pre-promotion with a bus tour, while still allowing qualification for Netflix Subscription. This screen selection will be completed as part of a marketing plan to be completed by Dec. 30, 2017.



3a.  GG is reserving the non- theatrical public performance rights and promotional sales in specialty markets, including but not limited to sale of DVD and Blue Ray in a version and format different from SONY packaging.

3b. INTERNATIONAL TERRITORY & MEDIA: With respect to territories outside of North America, it is understood and agreed that Sales Agency shall endeavor and shall use best efforts to place the International Sales rights for the Picture with Sony Pictures International ("Sony International"), under the international sales representation agreement between Sony International and Sales Agency.  Under the Sony International representation arrangement, Sony will place the Picture for distribution in all applicable territories and media worldwide where Sony International has internally operated sales and marketing or distribution divisions, and that revenues for Picture shall be treated on the same favored-nations basis as any other principal film sold for Sales Agency via Sony International.

4.  TERM:  The Initial Term for Sales Agency's representation of the Picture shall be for seven years (7) from the date of first release by Sales Agency  Sales Agency shall retain the option, at Sales Agency's sole discretion, to renew the Term for an additional seven years (7) years  if the cumulative total of net (actual) payments to the Licensor during the Initial Term, after recoupment of all releasing costs and interest shall have exceeded Two Million (USD $2,000,000.) in actual, net payments to Licensor as a result of Sale Agency's performance of its duties hereunder.

5.  SALES AGENCY'S MARKETING & DISTRIBUTION COSTS:   Sales Agency and GG shall agree upon a preliminary theatrical release marketing plan and budget for the release of the Picture into the Territory *(the "Theatrical Marketing Plan")* by December 30, 2017.  This Theatrical Marketing Plan shall detail Sales Agency's best recommendations for release methodologies of the Picture to qualify for a Netflix S.V.O.D. contract and to best position the Picture for maximum home video revenues.  Attached to this agreement are the following Exhibits which summarize the theatrical launch plans currently anticipated by Sales Agency, specifically:

   a) Exhibit "A" – *Theatrical Launch Markets* – Sales Agency is recommending that the Picture be released to theatres in the USA on or about March 23, 2018.  The target release includes at least fifty (50) theatres simultaneously in many of the top 40 largest DMA Markets in the United States; GG agrees to provide a bus tour which will use additional P and A monies under a separate budget to be reserved by and directed by GG, in the base amount of $50,000.  Sales agency agrees to provide the following services as outlined in Exhibit A -1  Exhibit A-1 to be defined based upon discussions with a deadline for preliminary conclusion by Dec 30, 2017 and final conclusion to by Jan 15, 2018.

   • Exhibit "B" – *Theatrical Release Budget* – Sales Agency feels that the release of the Picture to the above markets will cost approximately one-hundred fifty-thousand dollars (USD $150,000), which shall be provided to



Sales Agency by GG on the following schedule at the same time a marketing plan is delivered to GG by Sales agency: $50,000 by December 20, 2017, (This will be used to secure key theatres to satisfy NetFlix requirements and secure strategically appropriate theatres.) $50,000 by Jan 30, 2018; and $50,000 by March 1st, and additional monies as agreed to subject to the retention for bus tour expenses and subject to total agreement as to funding, as agreed to under the marketing plan. GG reserves the option, but not the obligation in GG's sole discretion to fund more than is called out here should it be shown to be a prudent expenditure of funds to insure GG distribution success. To the extent that the theatrical release of the Picture is expanded after the initial weekend, then Sales Agency shall coordinate with GG regarding the manner of release expansion and how such expansion shall be financed.

It is agreed between the parties that expenditures of funds will mutually agree to, and to be utilized in a prudent and thrifty manner to focus economic resources on promotion of Getting Grace.   It is expected that any expenditures will not be excessive.  Examples of "excessive" are high priced hotel rooms, first class airfare, or using Limousines rather than cabs or Uber.

b) **Exhibit "C" –** *Video Sell-In Detail (a summary of the anticipated, initial placement forecasts listed by each key USA video account and units);*

c) **Exhibit "D" –** *Basic Home Video Launch Costs / Costs of Goods & Fulfillment* – This Exhibit details the costs that SPHE shall incur (separate and apart from Theatrical P&A) for the preparation, packaging and launch of the Picture onto Home Video physical formats (DVD, Blu-ray); this Exhibit also lists the current pricing for bulk quantity DVD and Blu-ray manufacturing and outbound freight.

d) **Exhibit "E" –** International Sales Ranges & Profitability Analysis – estimated license fees and royalties by key territories and media.

e) **Exhibit "F" –** Overall Sales Ranges and Profitability Analysis – For managerial review purposes, Sales Agency has combined the total of all anticipated revenue sources (including international sales, theatrical sales, revenues from the Picture's anticipated license to Netflix, revenues from the Picture's home video and TVOD distribution and television sales), which sales ranges are divided into "Low-End," "Forecast," "Goal," and "Potential" performance ranges.

f) **Exhibit "G" –** Promissory Note to P&A Lenders.

g) **Exhibit "G -1" Promissory** Note for Minimum Guarantees

h) **Exhibit "H" –** Example "Direction of Payment" letter to buyers and licensors instructing that all payments be remitted solely and exclusively to Iberia Bank under a Lock box agreement.



6.  THEATRICAL & HOME VIDEO COMMITMENT DETAILS – If GG shall promptly provide the theatrical releasing costs as itemized on Exhibit "B" and per the terms of the Promissory Note as detailed on Exhibit "G", the following minimum theatrical release obligations shall apply:

a)      Minimum Number of Prints – At least fifty (50) locations / screens shall be opened simultaneously for the initial USA Theatrical Release, or such quantity as may be required to comply with the applicable Netflix Subscription Video-On-Demand license, Prior to the 50 screen initial opening, HHSE agrees to support GG in conducting a series of a pre-release "sneak peek" viewings as may be scheduled and supported by HHSE's key theatrical exhibitors. Plans for this to be developed as marketing plan is developed.

b)      Minimum Prints & Ads Expenditure – The theatrical release to theatres in the USA by Sales Agency shall include an expenditure of the previously indicate one-hundred-fifty-thousand ($150,000) plus those additional funds as may be required to do implement an effective bus tour ("Bus Tour"), which Bus Tour funds shall be provided separately and funded to suppliers and personnel directly by GG, but which shall still be covered under HHSE's obligations to fully repay all theatrical releasing costs under this agreement. For clarity, the total of the funds released by GG to HHSE, as well as those paid or incurred by GG during the Bus Tour shall be collectively referred to as the theatrical releasing P&A Funds. (the "P&A Funds").

c)  Minimum Theatrical Release Markets – The theatrical release of the Picture shall theatrical bookings in at least twenty of the top forty (40) largest markets, as measured by the Nielsen DMA list for 2016.

With respect to costs that Sales Agency will spend or incur during the marketing and Distribution of the Picture onto physical home video devices, including but not limited to the mastering, packaging and pre-manufacturing costs are expected to be limited to approximately ten-thousand dollars (USD $10,000), *("Basic Home Video Marketing Costs")*. These Basic Home Video Marketing Costs are itemized on Exhibit "D". It is understood and agreed that Sales Agency has been authorized by GG to include the North American sales of the Picture through Sony Pictures Home Entertainment Distributed Studios ("SONY"), and that SONY may incur home video launch costs in excess of the Basic Home Video Marketing Costs and the Consumer Ad Fund (as defined below); however, due to SONY's higher average wholesale pricing for home video units and SONY's ability to sell more video units to more locations than Sales Agency is generally capable of placing directly by Sales Agency, that GG shall not oppose SONY's direct and reasonable costs for the marketing of the Picture onto home video in North America, provided that said costs are consistent with those costs charged by SONY to other suppliers including other titles distributed or sold by Sales Agency.

In addition to the Basic Home Video Marketing Costs, SPHE shall be entitled, but not required, to spend up to twenty cents (USD $.20) per videogram unit shipped for additional advertising support *("Video Consumer Ad Fund")*. Lastly, all direct and reasonable

third-party costs incurred by Sales Agency for the physical manufacturing, replication, packaging, shipping and general order fulfillment of purchase orders for videograms of the Picture shall be recoupable by SPHE *("Manufacturing & Fulfillment Costs")*.

d. <u>Donation as part of promotions</u>. GG and HHSE have agreed to split the costs of a donation to the Children's Miracle network by crediting .50 each ($1 total) per unit for the first sixty-thousand (60,000) units sold. HHSE has agreed to evaluate the possibility of endorsement by this group and to potentially have members of the Getting Grace cast appear on telethon. Details of this alignment to be provided as part of the marketing plan.

7. **RIGHTS LICENSED:** Except as may be specified herein, Licensor is providing to Sales Agency and through them the rights to SPHE sole and exclusive right to license, sub-license, distribute, advertise, market and otherwise exploit all media rights, now known or hereafter devised, including without limitation theatrical, non-theatrical and physical home media in all formats, including DVD, Blu-Ray and UltraHD videograms, as well as all forms of video-on-demand and television broadcast and distribution through television and cable platforms. In granting Sales Agency these sales and representation rights, Licensor grants all customary and required rights to enable Sales Agency to perform its duties hereunder, including *(if applicable)* a license in the copyrights, trademarks and all other intellectual property rights necessary to exploit the Picture, in all applicable media, for the term from the execution hereof in the Territory, including, but not limited to, all customary and industry standard distribution rights necessary for the release, promotion, advertising, exhibition and other exploitation of the Picture, including, merchandising and all other ancillary rights relating to or arising out of the Picture. Sales Agency shall be authorized to utilize the corporate logo of Sales Agency, as well as to include text information identifying Sales Agency as the authorized Distributor in the Territory on all packaging and advertising for the Picture in the Territory. The rights licensed do not include sale or merchandising of tangible items based on or related to the Picture. GG acknowledges, approves and requires, for this agreement to be enforceable, the engagement of SONY, which is further defined in HHSE/SPHE AGREEEMENT, as the primary ancillary rights distributor for the Picture in the territory of North America, and further requires as a condition of this agreement, the addition of the SONY logo onto video packaging, and onto copies of the Picture.

8. **DELIVERY:** Licensor acknowledges that time is of the essence with respect to Delivery and the intention of both Licensor and Sales Agency to expand the release of the Picture to theatres on or about March 23, 2018, and to the home video market on or about June 2018. Accordingly, Licensor shall use reasonable good faith efforts to affect Final Delivery of the Picture to Sales Agency on or before December 30, 2017. Delivery of the Picture shall consist of all customary master elements and documents to enable Sales Agency to perform its duties under this Agreement, including but not limited to:

a). A quality DCP format master of the feature, or if no DCP exists, a high-definition format video master (either 4k compatible or Digital Hard Drive, 1080p X 1980 or HD CAM SR),

which video master shall be suitable as a source for the creation of a theatrical quality DCP release element.  The master shall contain a commercially suitable format of stereo and "split" audio tracks, synchronized to the visual elements of the Picture, and mixed in a professional manner; if available or needed for the creation of a trailer, the "stem" audio tracks shall also be delivered or made available to Sales Agency via a Lab Access letter.

b). A reasonable amount of art elements and digital graphic still images from the production (or HD "frame grabs") which are of a quality and quantity that would be suitable for the creation of key art posters, advertising and video packaging, as reasonably requested by Sales Agency; and,

c). Documentation as set forth in paragraph 10 (a), below, evidencing Licensor's authority to enter into this Agreement, including, but not limited to customary "chain-of-title" documentation, music rights and guild obligations, as well as an English subtitles dialogue track.

9. **SALES AGENCY FEES.**  With respect to International, *North American Theatrical*, Domestic Television and all forms of digital distribution sales,  the selected distributor (presumably Sony International and Sony Pictures Television) shall receive a Sales Agency Fee of twenty percent (20%) of all Gross Revenues received  from the exploitation of the Distribution Rights in all media as set forth in paragraph 3a, above, before deduction for the recoupment by Sales Agency of all of its direct and verifiable Distribution Costs and Expenses *(including the Theatrical P&A, the Basic Video Marketing Casts, the Consumer Video Ad Fund ond the Manufacturing and Fulfillment Costs)*.

With respect to North American Theatrical release, HHSE will be entitled to a distribution fee of 20% of the gross revenues collected.   HHSA distribution fee is based upon actual money collected.

With respect to physical home video sales (including DVD, BluRay and if applicable, Ultra BluRay), HHSE shall be entitled to its customary distribution fee of twenty-percent (20%).

With respect to revenues generated by Sony from Domestic Television and all forms of digital Video-On-Demand, including transactional and subscription forms,
after an initial sum of $48,000  from these revenues sources has been paid to GG, which shall be subordinate to SPHE's applicable fee of twenty percent (20%)  from these revenue streams, thereafter, HHSE will receive 8%

For clarity, HHSE shall not be entitled to any fees or revenue participations generated by SPHE or the applicable Sony International division, from sales, licenses and distribution of the Film into territories and media outside of North America ("International Sales"). However, all payments made to GG by Sony from International Sales shall be applied or otherwise credited to reduce the revenue guarantee amount as specified in paragraph 11-b below.

**10. DISTRIBUTION OF GROSS RECEIPTS and LOCKBOX :** All Gross Receipts derived from the distribution and all exploitation of the Picture, including theatrical payments, and SONY revenues, shall be paid solely and exclusively to the lock box as herein defined, established for the benefit of GG and the P&A Note and Revenue Guarantees as described herein. Film revenues shall be divided between the parties as follows and in the following order: (1) Sales Agency and Licensor shall be entitled to retain and / or be paid recoupment of all of each of their direct, reasonable, verifiable, and much as practicable, pre-approved out of pocket costs and expenses, not already paid for through the P&A funding pursuant to a marketing plan, incurred in release of the Picture, *(including any overage amounts of expenses approved by GG for the Theatrical P&A.* (2) Payments to HHSE and GG will be made at the same time as payments arrive at the lockbox, and shall be disbursed per the terms of this agreement.

Relative to theatrical distribution, determination of Gross Receipts shall be detailed in an accounting statement and applicable payment of Licensor's Net Revenues, which accountings shall be provided to Licensor by Sales Agency on a calendar quarterly basis, due on or before forty-five (45) days following the close of each calendar quarter.

Payment and reporting requirements for those rights and revenues handled by SPHE will be governed by HHSE/SPHE Agreement. HHSE agrees to provide access to theatrical information daily during the time the theatrical performance is running.

The parties agree that all revenues from all sources that are generated from Getting Grace will be paid solely and exclusively the Iberia Bank Lock box through their trust department. Located at:

> Iberia Bank Trust Department
> Attn: Chris Howe, Senior Vice President
> 706 S. Walton Blvd., Bentonville, AR 72712

**11. SALES AGENCY REVENUE / PAYMENT GUARANTEES TO GG** – It is understood and agreed that Sales Agency shall be obligated to pay to GG, the following sums as listed below as a Minimum Guarantee ("MG") against Licensor's Net Revenues, said payments to be rendered on or before twelve (12) months (or at the latest December 30, 2018) following full delivery of the *Picture (which obligations shall include Licensor's obligation to advance to Sales Agency the Theatrical P&A funds as itemized on Exhibit "B"), and rendered regardless of whether or not the total of "Licensor's Net Revenues" shall have met these sums:* Minimum Guarantee documentation will be handled separately in an agreed to promissory note in general form and terms outlined in Exhibit "G" to be made in a separate note labeled Exhibit "G-1" .

*a). USA & CANADA M.G.* – On or before the end of the twelfth month following delivery of the Picture, Sales Agency shall pay to GG the, as if yet unpaid sum, of the guaranteed two-hundred-fifty-thousand dollars (USD $250,000) as a M.G. against Licensor's Net



Revenues from any and all media sources generated in the territories of the United States and Canada;

*b). INTERNATIONAL M.G.* – On or before the end of the twelfth month following delivery of the Picture, Sales Agency shall pay to GG the, as if yet unpaid sum, of the guaranteed two-hundred-thousand dollars (USD $200,000) as a M.G. against Licensor's Net Revenues from any and all media sources generated in territories and media outside of the United States and Canada.

With respect to the Sales Agency's overall M.G. obligations, excess payments from either territory *(USA and Canada, or outside of USA and Canada)* shall be applied to reduce the overall obligation by Sales Agency to GG, should either territory not achieve the targeted goals as outlined above by the end of the twelfth month following delivery

*c). U.C.C. SECURITY INTEREST* - GG shall be authorized and otherwise empowered to file a U.C.C. Security Interest in and to the receivables and revenues of the Picture that are generated by Sales Agency or for the benefit of Sales Agency.

**12. WARRANTIES AND REPRESENTATIONS:**
(a)  Licensor warrants and represents to Sales Agency as follows:
(i) that it has full, complete and clear title to the Picture, free and clear of any liens, mortgages of copyrights or other encumbrances and that it owns and has the complete authority and all necessary consents to license the Distribution Rights to Sales Agency, to make Final Delivery of the Picture and to perform in accordance with this Agreement;
 (ii) that it currently has or, at the time of Final Delivery of the Picture, will have all right, license, music, usage, copyright, trademark, intellectual property and other clearances with regard to the Picture;
(iii) that the production services company for the Picture is a SAG signatory and the Picture was made in compliance with all SAG and other applicable union rules and collective bargaining agreements;
(iv) that Licensor is in compliance with all applicable creative, production, actor and other agreements which bind Licensor or the Picture; and
(v) that there are no other agreements or restrictions that would or will prevent the Distributor from exploiting the Distributions Rights in the manner provided for in this Agreement and otherwise in accordance with customary practice and industry standards.
(b)  Sales Agency warrants and represents to licensor:
(1) Sales Agency and its signatory has full and complete authority, power and consent to execute, deliver, enter into and perform under this agreement, without the necessity for giving further or additional notice to any party or for seeking or obtaining any further or additional consents or approvals, all of which have been attained.
(2)  By entering into and agreeing to perform under this Agreement, Sales Agency is not in violation of and will remain in compliance with Any agreements by which Sales Agency is bound, including those running in favor of banks, lenders or parties making advances with regard to this Agreement or distribution of the film.



**13. INDEMNITY:** Licensor will and does hereby agree to indemnify, defend, and hold Sales Agency harmless from and with egard to any and all third-party claims, liabilities, demands, settlements and suits arising out of or relating to the breach by Licensor of its obligations, warranties and representations under this Agreement. Sales Agency will and does hereby agree to indemnify, defend and hold Licensor harmless from and with regard to any and all third-party claims, liabilities, demands, settlements and suits arising out of or relating to the breach by Sales Agency of its obligations, warranties and representations under this Agreement and/or in connection with the marketing, advertising, distribution or other exploitation of the Picture.

(a). In addition to the above, Sales Agency agrees to:

(i)    Accord Licensor's customary credit and logo in advertising.

(ii)    Honor third party credit obligations in advertising (Licensor to provide statement of requirements);

(iii)    Leave intact all credits on the Picture as delivered (subject to Sales Agency's right to add credits as specified in Para. 6 and Para. 10 hereof).

**14. Notice and Opportunity to Cure and Survival of Certain Terms after Termination.** Except with regard to any performance for which it is specified that time is of the essence, the breaching party shall not be considered to be in breach or default unless and until the non-breaching party provides the breaching party with written notice specifying the nature and extent of the breaches and the breaching party fails to cure the breaches within ten (10) days after receipt of such notice. In the event that this Agreement is terminated for any reason, the indemnities, representations and warranties set forth in this Agreement shall survive.

**15. GENERAL PROVISIONS:** In the event of a dispute or lawsuit arising out of or relating to this Agreement, the prevailing party shall be entitled to recover its costs and expenses of suit, including reasonable outside attorneys' and experts' fees and actual out of pocket costs and this Agreement shall be governed by the laws of the State of Arkansas. This Agreement, any Exhibits attached hereto, and any written amendments signed by both parties which may be added shall constitute the entire agreement between the parties and, except as expressly provided herein, no other statement, promise, warranty or representation, whether written or verbal has been relied upon by the parties. The terms and provisions of this Agreement shall be severable and, in the event any part or all of any term or provision is determined to be unenforceable, the remainder shall be given and remain in full force and effect. This Agreement may be executed in counterparts and any photocopy, fax, scanned or emailed copy of this Agreement bearing one or more signatures shall be valid, binding and admissible into evidence, for all purposes, as though original. This Agreement shall not be construed against the drafter, as though it had been mutually and equally drafted by both parties. There is no Third-Party Beneficiary of this Agreement. This Agreement may be amended only in a writing signed by all parties. This

Agreement is binding on and shall inure to the benefit of the successors, assigns, heirs, beneficiaries, officer, directors and members of all parties.  Time is of the essence reading all terms and conditions of this Agreement.  Notices shall be by First Class US Mail, postage prepaid to either party at the address set forth herein, above, which address may be changed by any party by notice as provided for herein.  This Agreement may not be assigned except in writing and approved by all parties.  Regarding physical inventories of video units, and to the extent that surplus video units shall remain of the Picture which are deemed overstock or otherwise unsaleable, the ownership of these video units shall vest with Sales Agency until such time that Sales Agency conveys ownership over to GG through application of reimbursement of said video replication costs to GG This agreement constitutes a license to Sales Agency to make copies of the Picture onto videograms (DVD / BluRay and other physical pre-recorded formats), which copying activities are hereby authorized and shall not constitute a violation of GG's interest in and to the copyright of the Picture.

16. **AUDIT:** Licensor shall have the right to audit all of Sales Agency's books and records relating to sales, collections and expenses for the title up to twice per year, at Licensor's expense. In the event that the results of such audit reveal a shortfall in payments due to Licensor of more than three percent (3.0%), Sales Agency shall bear the costs of the audit up to ten-thousand dollars ($10,000).  Licensor shall inform Sales Agency in writing of its intention to audit with not less than five (5) business days' notice prior to commencement of the audit.  The audit shall be conducted during customary business hours at the principal location of Sales Agency's business in Fayetteville, Arkansas.  Any shortfall disclosed by the audit shall be paid to Licensor within fifteen (15) days of notice of such amount.  In addition, Sales Agency agrees to issue to licensor detailed statements on a monthly basis for the first six months following the initial release launch and on a quarterly basis thereafter, containing all pertinent information related to sales, collections, expenses and payments.

17. **COPIES.** Sales Agency shall provide Licensor with thirty (30) copies of the DVD and thirty (30) copies of the BluRay videograms free of charge. GG may also purchase from Sales Agency copies of the DVD or BluRay units of the Picture at "cost" for resale by GG to those to be sold directly by GG through web site and direct other means.

18. **SALES AGENCY'S CREDITS, LOGO AND DETAILS -** For clarity, Sales Agency and GG shall be authorized to place its video logo on all copies of the Picture.  With respect to home video packaging Sale Agency, GG. and SPHE shall be required to use their graphic logo on all video packing , and to place its graphic logo and address contact details on all home video packaging for the Picture.  Additionally, Hannover House be listed alongside GG as a "Presenter" of the Picture on the first line of the official credit block, e.g.:

**HANNOVER HOUSE  in association with GETTING GRACE, LLC Presents" or alternate name to be selected by Licensor**

... to be followed by the remainder of the legally required credit block information.

*SET FORTH ON THE ABOVE DATE, BY AND BETWEEN:*

20. **Creative approval of promotional materials.** GG reserves right to final approval of all promotional materials pertaining to Getting Grace, not to be unreasonably withheld.

Dated: 12-18-17

_____

Authorized Signatory
GETTING GRACE, LLC ("Licensor")

Dated: 12-18-17

_____

Eric Parkinson, C.E.O.
HANNOVER HOUSE, INC. and Medallion Releasing, Inc.
("Sale Agency")

Exhibit "A

## Getting Grace
*USA INITIAL LAUNCH - RELEASE MARKETS (MARCH 23, 2018)*

| Rank | DMA Name | TV Homes | US Mkt | Screens | Rationale' |
|---|---|---|---|---|---|
| 1 | New York (Buroughs & Greater Metro) | 7,348,620 | 6.41% | 3 | Top Ten DMA for Netflix |
| 2 | Los Angeles (Valleys, OC and Metro) | 5,476,830 | 4.78% | 4 | Top Ten DMA for Netflix |
| 3 | Chicago (Greater Metro) | 3,463,060 | 3.02% | 3 | Top Ten DMA for Netflix |
| 4 | Philadelphia (Greater Metro) | 2,942,800 | 1.57% | 3 | Top Ten DMA for Netflix |
| 5 | Dallas-Ft. Worth | 2,713,380 | 2.37% | 3 | Top Ten DMA for Netflix |
| 6 | San Francisco / Bay Area | 2,488,090 | 2.17% | 2 | Top Ten DMA for Netflix |
| 7 | Washington, D.C. / Hagerstown | 2,476,680 | 2.16% | 2 | Top Ten DMA for Netflix |
| 8 | Houston | 2,450,800 | 2.14% | 2 | Top Ten DMA for Netflix |
| 9 | Boston / Manchester | 2,424,240 | 2.11% | 1 | Top Ten DMA for Netflix |
| 10 | Atlanta | 2,412,730 | 2.10% | 3 | Top Ten DMA for Netflix |
| 11 | Tampa / St. Petersburg, FL | 1,908,590 | 1.66% | 2 | *NOT KEY MARKET* |
| 12 | Phoenix / Prescott | 1,890,100 | 1.65% | 2 | Top 25 plus Family Mkt. |
| 13 | Detroit / Ann Arbor, MI | 1,853,030 | 1.62% | 1 | *NOT KEY MARKET* |
| 14 | Seattle-Tacoma | 1,808,530 | 1.58% | 1 | *NOT KEY MARKET* |
| 15 | Minneapolis-St. Paul | 1,742,530 | 1.52% | 1 | Target - Best Buy HQ |
| 16 | Miami / Ft. Lauderdale, FL | 1,696,330 | 1.48% | 1 | *NOT KEY MARKET* |
| 17 | Denver-Boulder-Co. Springs | 1,630,380 | 1.42% | 2 | Top 25 plus Family Mkt. |
| 18 | Orlando-Daytona Beach-Melbourne | 1,519,570 | 1.33% | 2 | *NOT KEY MARKET* |
| 19 | Cleveland / Akron / Canton, OH | 1,458,960 | 1.31% | 1 | *NOT KEY MARKET* |
| 20 | Sacramnto-Stkton-Modesto | 1,379,770 | 1.20% | 1 | Top 25 plus Family Mkt. |
| 21 | St. Louis. MO | 1,215,570 | 1.06% | 1 | *NOT KEY MARKET* |
| 22 | Charlotte, NC | 1,189,950 | 1.04% | 1 | Solid Faith-Based Mkt. |
| 23 | Pittsburgh | 1,160,220 | 1.01% | 1 | *NOT KEY MARKET* |
| 24 | Raleigh-Durham-Fayetteville, NC | 1,153,580 | 1.01% | 1 | Solid Faith-Based Mkt. |
| 25 | Portland, OR | 1,143,670 | 1.00% | 1 | *NOT KEY MARKET* |
| 26 | Baltimore, MD | 1,119,480 | 0.98% | 0 | *NOT KEY MARKET* |
| 27 | Indianapolis | 1,086,310 | 0.95% | 1 | *NOT KEY MARKET* |
| 28 | San Diego-Oceanside | 1,065,700 | 0.93% | 1 | *NOT KEY MARKET* |
| 29 | Nashville, TN | 1,011,570 | 0.88% | 1 | Solid Faith-Based Mkt. |
| 30 | Hartford-New Haven | 963,950 | 0.84% | 0 | *NOT KEY MARKET* |
| 31 | San Antonio, TX | 938,650 | 0.82% | 0 | *NOT KEY MARKET* |
| 32 | Columbus, OH | 920,740 | 0.80% | 1 | *NOT KEY MARKET* |
| 33 | Kansas City, MO – KC Kansas | 919,020 | 0.80% | 1 | *NOT KEY MARKET* |
| 34 | Solt Lake-Ogden-Provo | 916,960 | 0.80% | 1 | Solid Faith-Based Mkt. |
| 35 | Milwaukee, WI | 895,700 | 0.78% | 1 | *NOT KEY MARKET* |
| 36 | Cincinnatti, OH | 863,800 | 0.75% | 0 | *NOT KEY MARKET* |
| 37 | Greenville-Asheville-Spart. | 845,990 | 0.74% | 1 | *NOT KEY MARKET* |
| 38 | West Palm Beach, FL | 824,920 | 0.72% | 0 | *NOT KEY MARKET* |
| 39 | Austin, TX | 771,210 | 0.67% | 1 | *NOT KEY MARKET* |
| 40 | Las Vegas | 757,840 | 0.66% | 0 | *NOT KEY MARKET* |
| 41 | Oklahoma City, OK | 722,140 | 0.63% | 1 | Solid Faith-Based Mkt. |
| 42 | Norfolk / Portsmouth / Newport News | 717,170 | 0.63% | 0 | *NOT KEY MARKET* |
| 43 | Harrisburg / Lancaster / Lebanon / York | 715,110 | 0.62% | 2 | Solid Faith-Based Mkt. |
| 44 | Grand Rapids / Kalamazoo / Battlecreek | 709,670 | 0.62% | 1 | Solid Faith-Based Mkt. |
| 45 | Bimmingham / Tuscaloosa, AL | 696,380 | 0.61% | 1 | Solid Faith-Based Mkt. |
| 46 | Greensboro / Winston-Salem | 690,050 | 0.60% | 1 | Solid Faith-Based Mkt. |
| 47 | Jacksonville, FL | 688,500 | 0.60% | 0 | *NOT KEY MARKET* |
| 48 | Albuquerque / Santa Fe, NM | 677,590 | 0.59% | 0 | *NOT KEY MARKET* |
| 49 | Louisville, KY | 662,170 | 0.58% | 1 | Solid Faith-Based Mkt. |
| 50 | New Orleans, LA | 641,620 | 0.56% | 0 | *NOT KEY MARKET* |
| 51 | Memphis, TN | 633,930 | 0.55% | 0 | *NOT KEY MARKET* |
| 54 | Fresno-Visalia, CA | 573,180 | 0.50% | 0 | Solid Faith-Based Mkt. |
| 55 | Richmond - Petersburg, VA | 564,510 | 0.49% | 0 | Solid Faith-Based Mkt. |
| 56 | Wilkes Barre / Scranton / Allentown | 554,660 | 0.48% | 1 | Solid Faith-Based Mkt. |
| 62 | Knoxville, TN | 514,610 | 0.45% | 1 | Solid Faith-Based Mkt. |
| 63 | Lexington, KY | 479,420 | 0.42% | 0 | Solid Faith-Based Mkt. |
| 66 | Wichita / Hutchinson | 439,760 | 0.38% | 0 | Solid Faith-Based Mkt. |
| 101 | Fayetteville-Rogers-Springdale | 304,670 | 0.27% | 1 | Walmart – SAMS H.Q. |
| | | 88,820,850 | 76.44% | 64 | |

"

Exhibit "B"

# Getting Grace

*Planned for March 23, 2018 Theatrical Launch - 50+ Screens*

| TYPE   ( w / Issue Date & On-Sale Date) | VENDOR OR AGENCY | TOTAL |
|---|---|---|
| KEY ART & ADS / CREATIVE (Graphics) | Oleum Rain | $1,250 |
| MPAA Film Rating | MPAA / CARA | $2,500 |
| TRAILER & TV EDITORIAL | Oleum Rain | $500 |
| TRAILER NARRATION | WME / SAG | $825 |
| TRAILER MUSIC LICENSES | Various / Allow | $0 |
| TRAILER MIX / COMPLETION ON 2k | Filmworks | $500 |
| DCP Trailer Drives (60) | Filmworks | $1,500 |
| DCP Feature Conversion | Filmworks | $2,500 |
| DCP Release Print Drives / with Key Codes (60) | Deluxe | $7,500 |
| DISTRIBUTION OF TRAILERS TO THEATERS | Various / Allow | $400 |
| DISTRIBUTE DCP FEATURE MASTERS TO THEATERS | Various / Allow | $930 |
| VPF FEES (Cinedigm, Dolby, DCIP) - 60+ theatres launch | Average at $725 | $43,500 |
| PRINT POSTERS (2,000 Lobby) | Roark Press | $1,880 |
| SHIP POSTERS (UPS) TO ALL 1st & 2nd Tier LOCATIONS | Various / Allow | $960 |
| GIANT BANNERS - NY, LA, CHI, DFW - 20 locations | Pengtool Graphics | $2,800 |
| OUTBOUND FREIGHT FOR WALL BANNERS | UPS / Various | $700 |
| SELF-DISPLAYING FLOOR MERCHANDISERS (30 X 84) - 50 | Stickers & Banners | $5,750 |
| GIANT BANNER PLACEMENT FEES / LABOR INSTALL | Various / Allow | $1,000 |
| **TOTAL MATERIALS & PREPARATION** | | **$74,995** |
| DISTRIBUTION OFFICE GENERAL BOOKING COSTS | Various / Allow | $19,500 |
| NATIONAL P.R. COORDINATION TEAMS | Indie-PR | $10,000 |
| NYC TALK SHOWS ALLOW - Hotel, Flights, Misc. | Various / Allow | $3,350 |
| PUBLICITY MATERIALS / POSTAGE / SCREENINGS | Various / Allow | $1,500 |
| INTERNET PUBLICITY CAMPAIGNS | Various / Allow | $3,750 |
| ADDL. WEB WORK & DIRECT MAILINGS | Various / Allow | $1,250 |
| **TOTAL PUBLICITY & INTERNET PROMOS** | | **$39,350** |
| FIVE THEATRES WITH $1,000 "COMPANION TICKET" Promos | Various / Allow | $5,000 |
| **TOTAL SPOT MARKET ADVERTISING** | | **$5,000** |
| EXHIBITOR EMAILS / SOCIAL / BANNERS | Various / Allow | $14,500 |
| LEASE & DECORATE TOUR BUS / 4-Weeks / 24 Stops | BUS TOUR EST. | $10,000 |
| BUS DRIVER / ASSISTANT / DAN ROEBUCK Fees for Tour | BUS TOUR EST. | $22,500 |
| FUEL (allow $100 / Day) / MEALS (allow 3 X $50 / Day) | BUS TOUR EST. | $7,000 |
| HOTELS - 2-rooms / 28 nights / allow $80 per night average | BUS TOUR EST. | $4,480 |
| REGIONAL PROMOTIONS DIRECTORS (27 locations / $300 ea) | BUS TOUR EST. | $8,100 |
| PRO-CHRISTIAN TARGETED PROMOTIONS | Various / Allow | $5,000 |
| THEATRE SPECIFIC FACEBOOK & SOCIAL | Various / Allow | $9,000 |
| **TOTAL CONSUMER PROMOS / ADS / TOUR** | | **$80,580** |

*TOTAL OF INITIAL MARKET OPENING COSTS* | | $199,925



Exhibit "C" – Estimated Video Sell-In by Key Accounts

# Getting Grace

*JULY 2018 SONY Home Video / SEPT. 2018 Netflix Streaming*
*Effective Walmart "Everyday Low Pricing DVD: $12.96 / Blu-Ray: $17.96*

| | LOW-END | | | FORECAST | | | GOAL LEVEL | | |
|---|---|---|---|---|---|---|---|---|---|
| | Units | Avg. Cost | Sub-total | Units | Avg. Cost | Sub-total | Units | Avg. Cost | Sub-total |
| AEC / Super D Wholsale (DVD) | 200 | $ 8.98 | $ 1,796 | 300 | $ 8.90 | $ 2,654 | 400 | $ 8.98 | $ 3,592 |
| AEC / Super D Wholes (Blu-Ray) | 50 | $ 10.93 | $ 549 | 75 | $ 10.98 | $ 824 | 100 | $ 10.98 | $ 1,098 |
| Canada (DVD) | 4,500 | $ 6.98 | $ 31,410 | 6,500 | $ 6.98 | $ 45,370 | 8,500 | $ 6.98 | $ 59,330 |
| Canada (Blu-Ray) | 600 | $ 8.98 | $ 5,388 | 900 | $ 8.98 | $ 8,082 | 1,200 | $ 8.98 | $ 10,776 |
| Amazon.com (DVD) | 350 | $ 8.98 | $ 3,143 | 500 | $ 8.98 | $ 4,490 | 700 | $ 8.98 | $ 6,286 |
| Amazon.com (Blu-Ray) | 75 | $ 9.90 | $ 749 | 125 | $ 9.98 | $ 1,248 | 175 | $ 9.98 | $ 1,747 |
| Baker & Taylor (DVD) | 200 | $ 9.98 | $ 1,996 | 300 | $ 9.98 | $ 2,994 | 400 | $ 9.98 | $ 3,992 |
| Baker & Taylor (Blu-Ray) | 50 | $ 10.98 | $ 549 | 75 | $ 10.98 | $ 824 | 100 | $ 10.98 | $ 1,098 |
| Barnes & Noble (DVD) | 900 | $ 8.98 | $ 8,082 | 1,200 | $ 8.98 | $ 10,776 | 1,600 | $ 8.98 | $ 14,368 |
| Barnes & Noble (Blu-Ray) | 200 | $ 10.98 | $ 2,196 | 300 | $ 10.98 | $ 3,294 | 400 | $ 10.98 | $ 4,392 |
| Best Buy (DVD) | 900 | $ 6.98 | $ 6,282 | 1,800 | $ 6.98 | $ 12,564 | 2,700 | $ 6.98 | $ 18,846 |
| Best Buy (Blu-Ray) | 1,000 | $ 9.90 | $ 17,964 | 2,400 | $ 9.98 | $ 23,952 | 3,600 | $ 9.98 | $ 35,928 |
| Ingram Misc. (DVD) | 300 | $ 7.98 | $ 2,394 | 500 | $ 7.98 | $ 3,990 | 800 | $ 7.98 | $ 6,384 |
| Ingram Misc. (Blu-Ray) | 100 | $ 9.96 | $ 998 | 200 | $ 9.98 | $ 1,996 | 300 | $ 9.98 | $ 2,994 |
| K-Mart (DVD) | 4,000 | $ 7.98 | $ 31,920 | 8,000 | $ 7.98 | $ 63,840 | 12,000 | $ 7.98 | $ 95,760 |
| K-Mart (Blu-Ray) | - | $ 9.98 | $ - | 1,500 | $ 9.98 | $ 14,970 | 3,000 | $ 9.98 | $ 29,940 |
| Krogers / Key Grocery (DVD Rentals) | 10,000 | $ 8.98 | $ 89,800 | 20,000 | $ 8.98 | $ 179,600 | 35,000 | $ 8.98 | $ 314,300 |
| Midwest Tape (DVD) | 300 | $ 8.98 | $ 2,694 | 500 | $ 8.98 | $ 4,490 | 1,000 | $ 8.98 | $ 8,980 |
| Midwest Tape (Blu-Ray) | 100 | $ 10.98 | $ 1,098 | 175 | $ 10.98 | $ 1,922 | 250 | $ 10.98 | $ 2,745 |
| Netflix (DVD) | 300 | $ 6.00 | $ 1,800 | 500 | $ 6.00 | $ 3,000 | 1,000 | $ 6.00 | $ 6,000 |
| Netflix (Blu-Ray) | 100 | $ 8.00 | $ 800 | 175 | $ 8.00 | $ 1,400 | 250 | $ 8.00 | $ 2,000 |
| Redbox (DVD) | 23,500 | $ 3.85 | $ 90,475 | 35,000 | $ 3.85 | $ 134,750 | 55,000 | $ 3.85 | $ 211,750 |
| Redbox (Blu-Ray) | - | $ 4.50 | $ - | 4,000 | $ 4.50 | $ 18,000 | 6,000 | $ 4.50 | $ 27,000 |
| SAMS Clubs (DVD) | - | $ 7.98 | $ - | 10,000 | $ 7.98 | $ 79,800 | 15,000 | $ 7.98 | $ 119,700 |
| Target (DVD) | 3,500 | $ 7.98 | $ 27,930 | 6,000 | $ 7.98 | $ 47,880 | 9,000 | $ 7.98 | $ 71,820 |
| Target (Blu-Ray) | - | $ 9.98 | $ - | 1,600 | $ 9.98 | $ 15,968 | 2,400 | $ 9.98 | $ 23,952 |
| Transworld (DVD) | 400 | $ 8.98 | $ 3,592 | 800 | $ 8.98 | $ 7,184 | 1,200 | $ 8.98 | $ 10,776 |
| Transworld (Blu-Ray) | 100 | $ 11.98 | $ 1,198 | 200 | $ 11.98 | $ 2,396 | 300 | $ 11.98 | $ 3,594 |
| Wal-Mart (DVD) | 38,600 | $ 7.25 | $ 279,850 | 48,000 | $ 7.25 | $ 348,000 | 66,200 | $ 7.25 | $ 479,950 |
| Wal-Mart (Blu-Ray) | 6,000 | $ 8.85 | $ 53,100 | 9,000 | $ 8.85 | $ 79,650 | 12,000 | $ 8.85 | $ 106,200 |

*GROSS VIDEO UNITS* | 91,775 | | $ 628,610 | 152,650 | | $ 1,066,977 | 230,375 | | $ 1,610,502 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *LESS RETURNS RESERVE (25%)* | | | $ (157,152) | | | $ (267,244) | | | $ (402,625) |
| *OTHER VIDEO-ON-DEMAND TRANSACTIONAL* | | | $ 180,000 | | | $ 240,000 | | | $ 360,000 |
| *LESS HH FEE (20%)* | | | $ (130,291) | | | $ (208,346) | | | $ (313,575) |
| *LESS BASE VIDEO MARKETING COSTS ** * | | | $ (25,000) | | | $ (25,000) | | | $ (25,000) |
| *LESS VIDEO CONSUMER MARKETING ** * | | | $ (18,355) | | | $ (30,570) | | | $ (46,075) |
| *LESS REPLICATION / FREIGHT* | | | $ (65,351) | | | $ (142,151) | | | |

*NET VIDEO TO PRODUCERS* | | | $ 492,460 | | | $ 635,665 | | | $ 1,183,226 |

| ADD-IN SONY T.V. REVENUES | | | $ 90,000 | | | $ 150,000 | | | $ 250,000 |

*TOTAL NET FOR ALL DOMESTIC MEDIA* | | | $ 482,460 | | | $ 785,665 | | | $ 1,433,226 |

EXHIBIT "D"   - Video Launch Costs & Costs of Video Goods

## Manufacturing and Shipping Cost of Goods Sold

○ *Current Replication Rates from Signature Media Services, Inc., Valencia, CA, based on initial order of one-hundred-thousand (100,000) units of DVD-5 Format*

• *SONY D.A.D.C. Replication Rates are comparable (within 10% more or less)*

Replication with four color art, top spine and black Amaray case with
Shrink wrap.   $0.51 each.                                    $51,000

O-Card @ $0.095 each.                                        $ 9,500

White Amaray case.  Add $0.05 each.                           $ 5,000

Freight.  Assume 80,000 palletized at average of $290/pallet
Shipping to four locations.                                   $ 5,800
Assume 20,000 units in 30 count boxes to miscellaneous locations   $ 6,000

Canadian Customs brokers.  Assume two shipments.              $    400

Red Box Spindled discs. Assume 40,000 units @ $0.23 each      $ 9,200

• *Current Replication Rates from Signature Media Services, Inc., Valencia, CA, based on initial order of fifty-thousand (50,000) units of standard BLURAY Format*

Replication with four color art, BD box with shrink wrap and
Top spine. With proof and AACS Certificate charges.          $67,150

Freight.  Assume One-half of DVD freight and no separate customs
and lower weight per disc.                                    $ 5,500

*Note:  Replication pricing subject to changing market conditions and quantities ordered;  freight rates also subject to variance based on fuel prices, urgency of delivery and weather factors.  The purpose of these rate estimates is to provide Licensor with a basis to understand the costs for the release of the Picture onto home video formats following the Picture's theatrical release.*



Exhibit "E"

# Getting Grace

*International Sales Ranges – By Territory*

| | | LOW | FORECAST | GOAL | POTENTIAL |
|---|---|---|---|---|---|
| Africa | Consolidated Distrib. | $ 1,000 | $ 1,400 | $ 1,750 | $ 2,250 |
| Africa | Nigeria | $ 1,000 | $ 1,400 | $ 1,750 | $ 2,250 |
| Africa | South Africa | $ 3,000 | $ 4,200 | $ 5,250 | $ 6,750 |
| Asia | China | $ 50,000 | $ 150,000 | $ 150,000 | $ 250,000 |
| Asia | Hong Kong | $ 1,500 | $ 2,100 | $ 2,625 | $ 3,375 |
| Asia | India | $ 3,000 | $ 4,200 | $ 5,250 | $ 6,750 |
| Asia | Japan | $ 15,000 | $ 21,000 | $ 26,250 | $ 33,750 |
| Asia | Pakistan | $ 1,000 | $ 1,400 | $ 1,750 | $ 2,250 |
| Asia | Russia | $ 10,000 | $ 14,000 | $ 17,500 | $ 22,500 |
| Asia | South Korea | $ 10,000 | $ 14,000 | $ 17,500 | $ 22,500 |
| Europe | Baltic States | $ 1,500 | $ 2,100 | $ 2,625 | $ 3,375 |
| Europe | Belgium | $ 3,000 | $ 4,200 | $ 5,250 | $ 6,750 |
| Europe | Bulgaria | $ 2,000 | $ 2,800 | $ 3,500 | $ 4,500 |
| Europe | Czech Republic | $ 2,000 | $ 2,800 | $ 3,500 | $ 4,500 |
| Europe | France | $ 20,000 | $ 28,000 | $ 35,000 | $ 45,000 |
| Europe | Germany / Austria | $ 30,000 | $ 42,000 | $ 52,500 | $ 67,500 |
| Europe | Greece | $ 1,500 | $ 2,100 | $ 2,625 | $ 3,375 |
| Europe | Hungary | $ 1,500 | $ 2,100 | $ 2,625 | $ 3,375 |
| Europe | Italy | $ 15,000 | $ 21,000 | $ 26,250 | $ 33,750 |
| Europe | Netherlands | $ 7,500 | $ 10,500 | $ 13,125 | $ 16,875 |
| Europe | Portugal | $ 5,000 | $ 7,000 | $ 8,750 | $ 11,250 |
| Europe | Romania | $ 1,000 | $ 1,400 | $ 1,750 | $ 2,250 |
| Europe | Serbia | $ 1,000 | $ 1,400 | $ 1,750 | $ 2,250 |
| Europe | Slovakia | $ 1,000 | $ 1,400 | $ 1,750 | $ 2,250 |
| Europe | Spain | $ 15,000 | $ 21,000 | $ 26,250 | $ 33,750 |
| Europe | United Kingdom | $ 20,000 | $ 28,000 | $ 35,000 | $ 45,000 |
| Europe | Yugoslav-States | $ 2,000 | $ 2,800 | $ 3,500 | $ 4,500 |
| Latin America | Central America | $ 5,000 | $ 7,000 | $ 8,750 | $ 11,250 |
| Latin America | Mexico | $ 10,000 | $ 14,000 | $ 17,500 | $ 22,500 |
| Middle East | Middle East / North Africa | $ 2,500 | $ 3,500 | $ 4,375 | $ 5,625 |
| Middle East | Turkey | $ 2,000 | $ 2,800 | $ 3,500 | $ 4,500 |
| Pacifica | Australia | $ 7,500 | $ 10,500 | $ 13,125 | $ 16,875 |
| Pacifica | Indonesia | $ 2,000 | $ 2,800 | $ 3,500 | $ 4,500 |
| Pacifica | Philippines | $ 2,000 | $ 2,800 | $ 3,500 | $ 4,500 |
| Pacifica | Singapore-Malaysia | $ 2,000 | $ 2,800 | $ 3,500 | $ 4,500 |
| Scandinavia | Denmark | $ 3,000 | $ 4,200 | $ 5,250 | $ 6,750 |
| Scandinavia | Finland | $ 1,000 | $ 1,400 | $ 1,750 | $ 2,250 |
| Scandinavia | Iceland | $ 1,000 | $ 1,400 | $ 1,750 | $ 2,250 |
| Scandinavia | Norway | $ 3,000 | $ 4,200 | $ 5,250 | $ 6,750 |
| Scandinavia | Sweden | $ 3,000 | $ 4,200 | $ 5,250 | $ 6,750 |
| South America | Argentina-Uruguay | $ 2,000 | $ 2,800 | $ 3,500 | $ 4,500 |
| South America | Brazil | $ 3,000 | $ 4,200 | $ 5,250 | $ 6,750 |
| South America | Chile | $ 1,500 | $ 2,100 | $ 2,625 | $ 3,375 |
| South America | Colombia | $ 1,500 | $ 2,100 | $ 2,625 | $ 3,375 |
| South America | Peru | $ 1,500 | $ 2,100 | $ 2,625 | $ 3,375 |

$ 278,000     $ 469,200     $ 549,000     $ 763,000



Exhibit "F"

# Getting Grace

*March 23 USA Theatrical / July, 2018 SONY Home Video & TVOD / Sept., 2018 Netflix SVOD*

## *Sales Ranges & Profitability Analysis*

### INTERNATIONAL SALES

| | Low-End | Forecast | GOAL | Potential |
|---|---|---|---|---|
| Gross International Sales Licenses | $ 278,000 | $ 469,200 | $ 549,000 | $ 763,000 |
| Less Sales Agency's International Fee (20%) | $ (55,600) | $ (93,840) | $ (109,800) | $ (152,600) |
| Less Intl. Marketing & Ads Costs | $ (15,000) | $ (20,000) | $ (25,000) | $ (30,000) |
| NET PRODUCER'S INTERNATIONAL | $ 207,400 | $ 355,360 | $ 414,200 | $ 580,400 |

### DOMESTIC THEATRICAL

| | Low-End | Forecast | GOAL | Potential |
|---|---|---|---|---|
| Number of PRINTS / DCP's | 85 | 100 | 150 | 200 |
| Total Number of PLAYDATES | 100 | 120 | 180 | 250 |
| GROSS BOX OFFICE | $265,000 | $420,000 | $900,000 | $1,500,000 |
| Net After Theatre's Share (40%) | $106,000 | $168,000 | $360,000 | $600,000 |
| Less HHSE Theatrical Fee (20%) | ($21,200) | ($33,600) | ($72,000) | ($120,000) |
| Less Prints & Ads (Cash, Terms & Barter) | ($200,000) | ($220,000) | ($250,000) | ($300,000) |
| NET PRODUCER'S THEATRICAL | ($115,200) | ($85,600) | $38,000 | $180,000 |

### DOMESTIC VIDEO

| | LOW-END | FORECAST | GOAL | POTENTIAL |
|---|---|---|---|---|
| 1st Wave NET (see Exhibit "D" sell-in sheet) | $ 482,460 | $ 785,665 | $ 1,433,226 | $ 1,791,533 |
| 2nd Wave Sell-Thru Units Shipped | 50,000 | 75,000 | 100,000 | 150,000 |
| 2nd Wave Sell-Thru Units Avg. Wholesale | $4.50 | $4.50 | $4.50 | $4.50 |
| 3rd Wave Sell-Thru Units Shipped | 20,000 | 30,000 | 40,000 | 60,000 |
| 3rd Wave Sell-Thru Units Avg. Wholesale | $3.05 | $3.05 | $3.05 | $3.05 |
| Addl. Net Transaction V.O.D. (VODwiz, VUDU) | $40,000 | $65,000 | $90,000 | $140,000 |
| GROSS VIDEO, 2nd & 3rd Waves | $ 326,000 | $ 494,000 | $ 662,000 | $ 998,000 |
| Less Returns (15-25% for applicable forms) | ($65,200) | ($98,800) | ($132,400) | ($199,600) |
| Less HHSE Video Fee - 2nd & 3rd Sales Wave | ($55,420) | ($83,980) | ($112,540) | ($169,660) |
| 2nd & 3rd Wave Replication & Freight Costs | ($49,000) | ($73,500) | ($98,000) | ($147,000) |
| NET PRODUCER'S VIDEO | $638,840 | $1,023,385 | $1,752,286 | $2,273,273 |

| | | | | |
|---|---|---|---|---|
| TOTAL "NET" THEATRICAL & PKGD GOODS | $ 523,640 | $ 937,785 | $ 1,790,286 | $ 2,453,273 |
| ADD-IN SONY NETFLIX DEAL | $ 200,000 | $ 200,000 | $ 247,500 | $ 412,500 |
| *Sony Fee on Netflix* | $ (40,000) | $ (40,000) | $ (49,500) | $ (82,500) |
| *HHSE Fee on Netflix* | $ (8,960) | $ (8,960) | $ (13,600) | $ (22,560) |

| PRODUCER'S TOTAL NET INCOME | $ 882,080 | $ 1,444,185 | $ 2,388,886 | $ 3,341,113 |
|---|---|---|---|---|

*NOTE:  DOES NOT INCLUDE "WORLD TELEVISION PREMIERE" SALE (HALLMARK / FAMILY CHANNEL)*

**Exhibit "G" – Terms & Corporate Promissory Note for P&A Loan**

## GETTING GRACE, LLC. – HANNOVER HOUSE, INC.

### PROMISSORY NOTE

PRINCIPAL SUM FUNDS AMOUNT:          Two-Hundred-Thousand Dollars
(USD $200,000)

December 30, 2017

Hannover House, Inc. and Medallion Releasing, Inc.
300 N. College Ave., Suite 311
Fayetteville, AR 82801
Attn: Eric F. Parkinson, C.E.O.
Tel. 479-521-5770 / Direct 818-481-5277
Email: Eric@Hannover House.com
(Referred to herein jointly and severally as "Borrower")

Getting Grace, LLC
(Referred to herein as "Creditor")

This Promissory Note is being issued by Borrower in respect of the terms of the agreement between Borrower and Getting Grace, LLS ("GG") for the distribution by Borrower of the feature film, "GETTING GRACE" (the "Picture") in the territory of North America (the "Territory"), in all applicable media. While both Creditor and Borrower believe that revenues from the distribution of the Picture in the Territory should be sufficient to fully pay this Promissory Note in a timely manner, Borrower agrees to pay or cause to be paid to Creditor, in a timely manner, the full amounts due at the maturation of this Promissory Note should collection revenues as from the distribution of the Picture result in any shortfall and balance due to Creditor at the end of the Term of this Promissory Note.

Upon demand by Creditor, Hannover House, Inc. and Medallion Releasing, Inc., (jointly and severally, "Borrower") promise to promptly pay to the order of Creditor, in lawful money of the United States of America, at its office indicated above or wherever else Creditor may specify in a writing delivered to Borrower, the amount as may be required upon maturation of this Promissory Note, to fully retire all remaining balances to this Promissory Note. This agreement (including all renewals, extensions or modifications hereof) shall be referred to as the "Note".

1.          <u>Principal</u>. The principal amount of this Note is two-hundred-thousand dollars



(USD $200,000) ("Principal"), which shall be paid by Creditor to Borrower as follows: $50,000 within five (5) business days of execution of this Promissory Note or Dec. 18, 2017, whichever shall occur first; a second payment of $50,000 on or before Jan. 31, 2018; a third payment of $50,000 on or before March 1, 2018 – and additional sum estimated at $50,000 to be paid directly by GG to vendors and for costs associated with the Bus Tour as described in the representation agreement.  This Note shall have a one (1) year maturation date and shall be paid in full on or before December 30, 2018, including Principal, all accrued interest and the applicable Investment Advisory Fee ("IAF") due to Creditor as described below.

2.         Interest Rate.  Interest shall accrue on the unpaid principal balance of this Note
at a per

annum rate equal to seven percent (7%) (the "Interest Rate").

3.         Investment Advisory Fee –Creditor shall be entitled to an Investment Advisory Fee ("IAF") of sixteen-thousand dollars (USD $16,000) in consideration of Creditor's costs associated with the issuance and funding of this Note, as well as for advisory consultation to be provided to Borrower with respect to Borrower's obligations under this Note and under the Sales Agency Agreement with GG for the Picture.

4.    Interest and Fee(s) Computation. Interest and fees, if any, shall be computed on the basis of a 360-day year for the actual number of days in the applicable period ("Actual/360 Computation").  The Actual/360 Computation determines the annual effective interest yield by taking the stated (nominal) rate for a year's period and then dividing said rate by 360 to determine the daily periodic rate to be applied for each day in the applicable period.  Application of the Actual/360 Computation produces an annualized effective rate exceeding the nominal rate.

5.    Application of Payments. Monies received by Creditor from any source for application toward payment of the Obligations shall be applied first to all of Creditor's reasonable expenses incurred to enforce or collect any of the Obligations, then to accrued interest, then to the IAF and then to principal.  If a Default occurs, monies may be applied to the Obligations in any manner or order deemed appropriate by Creditor.

If any payment received by Creditor under this Note is rescinded, avoided or for any reason returned by Creditor, the returned payment shall remain payable as an obligation of the Borrower under this Note as though such payment had not been made.

6.  Security Interest.  Creditor shall be authorized to file and otherwise record a U.C.C. Security Interest in and to all of the revenues to be derived from the distribution of the Picture by Borrower ("Security Interest"), which Security Interest shall be entitled to survive until such time that the Principal, applicable interest and IAF shall have been fully and indefeasibly paid to Creditor. To the fullest extent possible and utilizing best efforts to enforce, Borrower shall instruct all licensors, sub licensors, customers, purchasers, exhibitors and distributors of the Picture in the Territory to designate all revenue payments to a specially designated and segregated bank account ("Collections

Account") for the benefit of Creditor. The Collections Account shall be maintained by IBERIA bank Trust Department Attn: Chris Howe, Senior Vice President, 706 South Walton Blvd, Bentonville AR, 72712..

      7.   <u>Definitions</u>.  The term "Obligations", as used in this Note, refers to any and all indebtedness and other obligations under this Note.

      8.   <u>Attorneys' Fees and other Collection Costs</u>.   Borrower shall pay all of Creditor's reasonable expenses incurred to enforce or collect any of the Obligations including, without limitation, reasonable attorneys' fees and expenses, whether incurred without the commencement of a suit, in any trial, arbitration, or administrative proceeding, or in any appellate or bankruptcy proceeding.

      9.   <u>Usury</u>.  If at any time the effective interest rate under this Note would, but for this paragraph, exceed the maximum lawful rate, the effective interest rate under this Note shall be the maximum lawful rate, and any amount received by Creditor in excess of such rate shall be applied to principal and then to fees and expenses, or, if no such amounts are owing, returned to Borrower.

      10.   <u>Default</u>.  If any of the following occurs, a default ("Default") under this Note shall exist: (i) failure of the Borrower to pay the Note when due plus the ten (10) calendar day cure period set forth herein; (ii) failure of the Borrower to observe any term, covenant, warranty, or agreement contained in this Note unless such failure is cured within 10 calendar days of receipt by the Borrower of written notice from the Creditor of such event of Default; (iii) the filing of any voluntary or involuntary bankruptcy, reorganization or insolvency, or the appointment of a receiver for the Borrower; (iv) the Creditor determines in good faith, in its sole discretion, that the prospects for payment or performance of the Obligations are impaired or there has occurred a material adverse change in the business or prospects of Borrower, financial or otherwise; or (v) Eric Parkinson is not actively involved as a senior executive for the Borrower for a period of thirty consecutive (30) days.

      11.   <u>Remedies upon Default</u>. Upon occurrence of an event of Default, subject to any cure period specified herein, the Creditor may, by written notice to the Borrower, declare the total unpaid principal, accrued interest and IAF immediately due and payable. No delay by Borrower in exercising any power or right will operate as a waiver of such power or right, nor will any single or partial exercise of any power or right preclude any other future exercise of such power or right.  In the event that Borrower fails to promptly remit to Creditor the amount of a meritorious and uncured demand, including the IAF, then Creditor shall be entitled to enter a Consent Judgment against Borrower, and enjoy all of the rights and remedies available as the holder of a Consent Judgment, including, but not limited to, the right to demand that if Borrower is unable to promptly pay Creditor in cash, that Borrower would be obligated to issue freely-trading stock shares in Hannover House, Inc. (OTC: HHSE), or any publicly-traded successor to Hannover House, Inc., in the amount of the Consent Judgment ("Stock Conversion Option"). The determination of the quantity of HHSE or successor stock shares that Creditor would be entitled to receive in this instance shall be calculated based upon



the Volume Weighted Average Price of the HHSE shares during the prior ten (10) trading days for that equity, commencing from the date of demand by Creditor for the payment by Borrower under this Note. Creditor is under no obligation to exercise the Stock Conversion Option in the event of an uncured default by Borrower, and Creditor may demand payment in cash.

12.     <u>Waivers and Amendments</u>. No waivers, amendments or modifications of this Note shall be valid unless in writing and signed by an officer of Creditor. No waiver by Creditor of any Default shall operate as a waiver of any other Default or the same Default on a future occasion. Neither the failure nor any delay on the part of Creditor in exercising any right, power, or remedy under this Note shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

The Borrower waives presentment, protest, notice of dishonor, demand for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, notice of sale and all other notices of any kind. Further, each agrees that Creditor may extend, modify or renew this Note for any period, and grant any releases, compromises or indulgences related to the Note, all without notice to or consent of the Borrower without affecting the liability of Borrower under this Note.

13.     <u>Miscellaneous Provisions</u>.

(a)     <u>Assignment</u>. This Note shall inure to the benefit of and be binding upon the parties and their respective heirs, legal representatives, successors and assigns. Creditor's interests in and rights under this Note are freely assignable, in whole or in part, by Creditor. Borrower shall not assign its rights and interest hereunder without the prior written consent of Creditor, and any attempt by Borrower to assign without Creditor's prior written consent is null and void. Any assignment shall not release Borrower from the Obligations.

(b).    <u>Representations</u>. Borrower represents that Borrower (i) is a duly organized and legal entity (ii) has the power and authority to own its properties and assets and to carry on its business as now being conducted and as now contemplated; and (iii) has the power and authority to execute, deliver and perform, and by all necessary action has authorized the execution, delivery and performance of, all of its obligations.

(c)     <u>Applicable Law</u>. This Note shall be governed by and construed under the laws of the state of New York without regard to that state's conflict of laws principles. Jurisdiction and Venue for any action or proceeding with regard to this Promissory note shall be Washington County, Arkansas.

(d)     <u>Severability</u>. If any provision of this Note shall be prohibited or invalid under applicable law, such provision shall be ineffective but only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note. This is an integrated agreement and document and this Note, and other documents specifically referenced herein, and any written amendments signed by both parties which may be added shall



constitute the entire agreement between the parties and, except as expressly provided herein, no other statement, promise, warranty or representation, whether written or verbal has been relied upon by the parties.

(e)     Notices. Any notices to Borrower shall be sufficiently given, if in writing and mailed or delivered to the Borrower's address shown above or such other address as provided hereunder, and to Creditor, if in writing and mailed or delivered to the address shown above or such other address as Creditor may specify in writing from time to time. In the event that Borrower changes Borrower's address at any time prior to the date the Obligations are paid in full, Borrower agrees to promptly give written notice of said change of address by registered or certified mail, return receipt requested, all charges prepaid.

**IN WITNESS WHEREOF**, Borrower, on the day and year first above written, has caused this Note to be executed.

Borrower:
Hannover House. Inc. and Medallion Releasing, Inc.

Eric Parkinson, C.E.O.

**Acknowledged and Agreed by Creditor:**

Getting Grace, LLC

By: Authorized Signatory

**Exhibit "G-1" – Terms & Corporate Promissory Note for P&A Loan**

## GETTING GRACE, LLC. – HANNOVER HOUSE, INC.

## PROMISSORY NOTE

PRINCIPAL SUM FUNDS AMOUNT:

Four-Hundred Fifty Thousand Dollars
(USD $450,000.)

December 30, 2017

Hannover House, Inc. and Medallion Releasing, Inc.
300 N. College Ave., Suite 311
Fayetteville, AR 82801
Attn: Eric F. Parkinson, C.E.O.
Tel. 479-521-5770 / Direct 818-481-5277
Email: Eric@Hannover House.com
(Referred to herein jointly and severally as "Borrower")

Getting Grace, LLC
(Referred to herein as "Creditor")

This Promissory Note is being issued by Borrower in respect of the terms of the agreement between Borrower and Getting Grace, LLS ("GG") pertaining to the Minimum Guarantee being promised in exchange for rights to distribute by Borrower the feature film, "GETTING GRACE" (the "Picture") in the territory of North America (the "Territory"), in all applicable media. While both Creditor and Borrower believe that revenues from the distribution of the Picture in the Territory should be sufficient to fully pay this Promissory Note in a timely manner, Borrower agrees to pay or cause to be paid to Creditor, in a timely manner, the full amounts due at the maturation of this Promissory Note should collection revenues as from the distribution of the Picture result in any shortfall and balance due to Creditor at the end of the Term of this Promissory Note.

Upon demand by Creditor, Hannover House, Inc. and Medallion Releasing, Inc., (jointly and severally, "Borrower") promise to promptly pay to the order of Creditor, in lawful money of the United States of America, at its office indicated above or wherever else Creditor may specify in a writing delivered to Borrower, the amount as may be required upon maturation of this Promissory Note, to fully retire all remaining balances to this Promissory Note. This agreement (including all renewals, extensions or modifications hereof) shall be referred to as the "Note".



1   Principal. The principal amount of this Note is Four-Hundred Fifty thousand dollars
(USD $450,000) ("Principal"), which has been paid in the production of the film Getting Grace. This
note represents the combined Minimum Guarantee payment from Borrower to Creditor.   This Note
shall have a one (1) year maturation date and shall be paid in full on or before December 30, 2018,
including Principal, all accrued interest and the applicable Investment Advisory Fee ("IAF") due to
Creditor as described below.

2.        Interest Rate. Interest shall accrue on the unpaid principal balance of this Note at a per
annum rate equal to seven percent (7%) (the "Interest Rate").

3..      Interest and Fee(s) Computation. Interest and fees, if any, shall be computed on the
basis of a 360-day year for the actual number of days in the applicable period ("Actual/360
Computation"). The Actual/360 Computation determines the annual effective interest yield by taking
the stated (nominal) rate for a year's period and then dividing said rate by 360 to determine the daily
periodic rate to be applied for each day in the applicable period.  Application of the Actual/360
Computation produces an annualized effective rate exceeding the nominal rate.

4.      Application of Payments. Monies received by Creditor from any source for application
toward payment of the Obligations shall be applied first to all of Creditor's reasonable expenses
incurred to enforce or collect any of the Obligations, then to accrued interest, then to the IAF and
then to principal.  If a Default occurs, monies may be applied to the Obligations in any manner or
order deemed appropriate by Creditor.

If any payment received by Creditor under this Note is rescinded, avoided or for any reason
returned by Creditor, the returned payment shall remain payable as an obligation of the Borrower
under this Note as though such payment had not been made.

.5.      Security Interest.  Creditor shall be authorized to file and otherwise record a U.C.C.
Security Interest in and to all of the revenues to be derived from the distribution of the Picture by
Borrower ("Security Interest"), which Security Interest shall be entitled to survive until such time that
the Principal, applicable interest and IAF shall have been fully and indefeasibly paid to Creditor. To
the fullest extent possible and utilizing best efforts to enforce, Borrower shall instruct all licensors,
sub licensors, customers, purchasers, exhibitors and distributors of the Picture in the Territory to
designate all revenue payments to a specially designated and segregated bank account ("Collections
Account") for the benefit of Creditor.  The Collections Account shall be maintained by IBERIA bank
Trust Department Attn: Chris Howe, Senior Vice President, 706 South Walton Blvd,  Bentonville
AR,  72712..

6.      Definitions.  The term "Obligations", as used in this Note, refers to any and all



indebtedness and other obligations under this Note.

     **7..**    <u>Attorneys' Fees and other Collection Costs</u>.  Borrower shall pay all of Creditor's reasonable expenses incurred to enforce or collect any of the Obligations including, without limitation, reasonable attorneys' fees and expenses, whether incurred without the commencement of a suit, in any trial, arbitration, or administrative proceeding, or in any appellate or bankruptcy proceeding.

     **8..**    <u>Usury</u>.  If at any time the effective interest rate under this Note would, but for this paragraph, exceed the maximum lawful rate, the effective interest rate under this Note shall be the maximum lawful rate, and any amount received by Creditor in excess of such rate shall be applied to principal and then to fees and expenses, or, if no such amounts are owing, returned to Borrower.

     **9.**    <u>Default</u>.  If any of the following occurs, a default ("Default") under this Note shall exist: (i) failure of the Borrower to pay the Note when due plus the ten (10) calendar day cure period set forth herein; (ii) failure of the Borrower to observe any term, covenant, warranty, or agreement contained in this Note unless such failure is cured within 10 calendar days of receipt by the Borrower of written notice from the Creditor of such event of Default; (iii) the filing of any voluntary or involuntary bankruptcy, reorganization or insolvency, or the appointment of a receiver for the Borrower; (iv) the Creditor determines in good faith, in its sole discretion, that the prospects for payment or performance of the Obligations are impaired or there has occurred a material adverse change in the business or prospects of Borrower, financial or otherwise; or (v) Eric Parkinson is not actively involved as a senior executive for the Borrower for a period of thirty consecutive (30) days.

     10.    <u>Remedies upon Default</u>. Upon occurrence of an event of Default, subject to any cure period specified herein, the Creditor may, by written notice to the Borrower, declare the total unpaid principal, accrued interest and IAF immediately due and payable. No delay by Borrower in exercising any power or right will operate as a waiver of such power or right, nor will any single or partial exercise of any power or right preclude any other future exercise of such power or right.  In the event that Borrower fails to promptly remit to Creditor the amount of a meritorious and uncured demand, including the IAF, then Creditor shall be entitled to enter a Consent Judgment against Borrower, and enjoy all of the rights and remedies available as the holder of a Consent Judgment, including, but not limited to, the right to demand that if Borrower is unable to promptly pay Creditor in cash, that Borrower would be obligated to issue freely-trading stock shares in Hannover House, Inc. (OTC: HHSE), or any publicly-traded successor to Hannover House, Inc., in the amount of the Consent Judgment ("Stock Conversion Option"). The determination of the quantity of HHSE or successor stock shares that Creditor would be entitled to receive in this instance shall be calculated based upon the Volume Weighted Average Price of the HHSE shares during the prior ten (10) trading days for that equity, commencing from the date of demand by Creditor for the payment by Borrower under this Note.  Creditor is under no obligation to exercise the Stock Conversion Option in the event of an uncured default by Borrower, and Creditor may demand payment in cash.



11.     Waivers and Amendments.  No waivers, amendments or modifications of this Note shall be valid unless in writing and signed by an officer of Creditor.  No waiver by Creditor of any Default shall operate as a waiver of any other Default or the same Default on a future occasion. Neither the failure nor any delay on the part of Creditor in exercising any right, power, or remedy under this Note shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

The Borrower waives presentment, protest, notice of dishonor, demand for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, notice of sale and all other notices of any kind.  Further, each agrees that Creditor may extend, modify or renew this Note for any period, and grant any releases, compromises or indulgences related to the Note, all without notice to or consent of the Borrower without affecting the liability of Borrower under this Note.

12.     Miscellaneous Provisions.

(a)     Assignment.  This Note shall inure to the benefit of and be binding upon the parties and their respective heirs, legal representatives, successors and assigns.  Creditor's interests in and rights under this Note are freely assignable, in whole or in part, by Creditor.  Borrower shall not assign its rights and interest hereunder without the prior written consent of Creditor, and any attempt by Borrower to assign without Creditor's prior written consent is null and void.  Any assignment shall not release Borrower from the Obligations.

(b).     Representations.  Borrower represents that Borrower (i) is a duly organized and legal entity (ii) has the power and authority to own its properties and assets and to carry on its business as now being conducted and as now contemplated; and (iii) has the power and authority to execute, deliver and perform, and by all necessary action has authorized the execution, delivery and performance of, all of its obligations.

(c)     Applicable Law.  This Note shall be governed by and construed under the laws of the state of New York without regard to that state's conflict of laws principles. Jurisdiction and Venue for any action or proceeding with regard to this Promissory note shall be Washington County, Arkansas.

(d)     Severability.  If any provision of this Note shall be prohibited or invalid under applicable law, such provision shall be ineffective but only to the extent of such prohibition or availability, without invalidating the remainder of such provision or the remaining provisions of this e. This is an integrated agreement and document and this Note, and other documents specifically referenced herein, and any written amendments signed by both parties which may be added shall constitute the entire agreement between the parties and, except as expressly provided herein, no other statement, promise, warranty or representation, whether written or verbal has been relied upon by the parties.

(e)     Notices.  Any notices to Borrower shall be sufficiently given, if in writing and mailed



or delivered to the Borrower's address shown above or such other address as provided hereunder, and to Creditor, if in writing and mailed or delivered to the address shown above or such other address as Creditor may specify in writing from time to time. In the event that Borrower Changes Borrower's address at any time prior to the date the Obligations are paid in full, Borrower agrees to promptly give written notice of said change of address by registered or certified mail, return receipt requested, all charges prepaid.

**IN WITNESS WHEREOF**, Borrower, on the day and year first above written, has caused this Note to be executed.

Borrower:

Hannover House, Inc. and Medallion Releasing, Inc.

Eric Parkinson, C.E.O.

**Acknowledged and Agreed by Creditor:**

Getting Grace, LLC

By: Authorized Signatory

Exhibit "H"

**HANNOVER HOUSE, INC. / MEDALLION RELEASING, INC.**

**300 N. College Ave., Suite 311, Fayetteville, AR 72701**

## NOTICE OF IRREVOCABLE ASSIGNMENT AND DIRECTION OF PAYMENT

Dated as of December 15, 2017

To: *TO BE ADDRESSED TO ACTUAL PURCHASERS / CUSTOMERS & EXHIBITORS OF THE FILM.*

Re: ANY AND ALL REVENUES or PAYMENTS DUE TO HANNOVER HOUSE, INC. OR MEDALLION RELEASING, INC. DERIVED FROM THE FEATURE FILM, "GETTING GRACE"

Gentlemen – Reference is hereby made to that certain Loan Agreement ("**Agreement**") dated as of December 18, 2017 between private lenders ("**Creditor**") with HANNOVER HOUSE INC. and MEDALLION RELEASING, INC., (referred to hereunder collectively as "Borrower") with respect to the assignment of revenues derived from the release of the feature film property known as "**Getting Grace**" (the "**Film**"), which Borrower shall be releasing to theatres, home video formats, video-on-demand and other applicable media in the territory of the United States and Canada.

You are hereby instructed to remit to the attorney Client Trust Account specified below, _any and all payments_ that would otherwise be due and payable to Borrower from the release of the Film until such time that you receive written acknowledgement from Creditor or IBERIA BANK, that this letter of assignment and irrevocable direction of payments has been satisfied or otherwise rescinded.  Borrower may not unilaterally rescind these payment directions unless acknowledged or otherwise confirmed in writing by Creditor or IBERIA BANK. You are hereby instructed to remit all payments for the Film, as such sums become due and payable under the existing terms of your relationship with Borrower, made payable to Borrower, but remitted to the address below:

**REMIT ALL PAYMENTS TO:**
**IBERIA BANK TRUST DEPARTMENT**
**Attn: Chris Howe, Senior Vice President**
**706 S. Walton Blvd., Bentonville, AR 72712**

Borrower hereby warrants and represents that Borrower has not heretofore assigned, transferred or otherwise disposed of the Payments otherwise payable to Borrower which are being assigned hereunder.

Very truly yours,

By: _____

Eric F. Parkinson, C.E.O.

Hannover House, Inc. / Medallion Releasing, Inc. ("Borrower")

DRAFT . DRAFT . DRAFT.      **DISTRIBUTION OF FUNDS Memorandum      DRAFT, DRAFT, DRAFT**

**By and Between:  Getting Grace LLC (Movie Maker), Hannover House (Initial Movie Distributor) and Random Media**

This is written to clarify understandings between the parties relative the relative positions regarding the distribution of income from the distribution of the movie "Getting Grace".

Getting Grace LLC., has an agreement with Hanover House to distribute the film Getting Grace to Theatres and on video in an agreement dated December 19, 2017

In an effort to access more channels of release, Hannover House made an agreement with Random Media, so that the film could be distributed through Sony Home entertainment.

Hannover House agreed to split their income only from the movie distribution with Random House. Getting Grace has no financial obligation to Random Media except the portion promised out of Hannover's percentage, agreed to in the December 19, 2017 agreement.

For efficiency of distribution the following is agreed to relative to the distribution of income.

1. Random Media will receive the income generated through their direct involvement in the distribution of the film "Getting Grace", in a timely manner upon receipt
2. As money is delivered, Random Media will retain amount equal to what is owed to them by Hannover House, and remit ALL remaining monies to Getting Grace LLC., directly at the following address:      GETTING GRACE FILM, LLC

   % Samantha Edwards

   3388 Courtney Drive

   Center Valley, PA 18034

   It is anticipated that these payments will be made monthly.

3. Getting Grace will remit to Hannover House in a timely manner par Passau with the monies received from Random Media.  This remittance will be calculated by the amount owed to Hannover house per the December 19, 2017 agreement, less the amount of monies retained by Random Media.

Signature lines

# EXHIBIT B

**From:** Eric Parkinson ██████████████
**Date:** October 25, 2018 at 12:46:48 PM EDT
**To:** ████████████████
**Subject: Sudden major emergency... re GETTING GRACE DVD & Lab**

Dan – Last night I received an email from the CFO at SIGNATURE MEDIA (a woman named "BO") that "the owner" of Signature Media had overruled Tracy Vosburgh (our account rep) and decided to NOT extend replication credit for GETTING GRACE. The rationale for changing credit terms was that "Fred Shefte did not make the Oct. 1st payment and did not contact them." Tracy understands that this has been due to Fred's prolonged hospitalization – and his failure to reassign many of his daily operational tasks before being hospitalized. So Tracy has been very sympathetic. But when the first DVD-9 Stamper came back as Flawed last week (their fault, not Tammy's), Bo said that the owner of Signature Media freaked out at having to eat the cost of doing another stamper... and wanted to know why the Oct. 1st payment from Hannover House had not been received.

The product will be ready TOMORROW to ship out. I have already arranged for the FREIGHT via OLD DOMINION – which will be via a dedicated HOT SHOT TRUCK to Shepherdsville, KY (a Louisville suburb).

But I am in a total freakin' PANIC right now to come up with the $12,100 to pay Signature Media for the GETTING GRACE DVD replication costs. Fred has always handled our "collections" – and since Sept. 4, literally NO ONE has been calling customers to collect. So I'm doing that now and trying to raise cash.

I will keep you posted.

MEANWHILE – It is my legal responsibility to inform you that Fred Shefte's heart surgery last week was NOT successful... and that he is still hospitalized with arrythmia and congestive heart failure. The local doctors have said that there is nothing else that they can do for him... except hospice care. Fred and I are working to find a second opinion or better options at a larger hospital such as the University of Kansas Medical Center in Kansas City... or Cedar's Sinai in Beverly Hills.

**Eric Parkinson, C.E.O.**
Hannover House & Affiliated Studios
Medallion Releasing, Inc. / Bookworks, Inc.
300 N. College Ave., Suite 311
Fayetteville, AR  72701 / Tel 479-521-5770 ████████████████



Eric Parkinson ████████████████
To: ████████████████
Cc: ████████████████████████████████████
Oct 25, 2018 at 6:36 PM

It can be ONE charge immediately for $5,948.80... or if you're concerned that this is a "large" amount... then do SIX transactions for $1,000 each.  But PLEASE, let's accept this payment format so that we do not miss our Walmart street date!!

**Eric Parkinson, C.E.O.**
**Hannover House & Affiliated Studios**
**Medallion Releasing, Inc. / Bookworks, Inc.**
300 N. College Ave., Suite 311
Fayetteville, AR  72701 / Tel 479-521-5770

-----Original Message-----
From:
To: 'Eric Parkinson'
Cc: graphics ; fredshefte1 ; Tracy

Sent: Thu, Oct 25, 2018 1:26 pm
Subject: RE: Please call HHSE Lender for Credit Card payment

David told me that we need a wire transfer because we need to see that the money is available in our bank account. Credit cards are tricky when it comes to banks it doesn't show up until three days later please find a way to wire the money into our bank of America account.

**From:** Eric Parkinson
**Sent:** Thursday, October 25, 2018 11:01 AM
**To:**
**Cc:**
**Subject:** Please call HHSE Lender for Credit Card payment

Dear Lauren / Bo - as per my call with David (and your prior email), we can remit a payment of $5,948.80 via CREDIT CARD, which has been calculated as follows:

TOTAL "NEW BILL" - $11,440
50% Credit Card:    $5,720
4% "Credit Card" Fee: $228.80

TOTAL PAYMENT:  $5,948.80

**Please call the lender, Sarkis Mouradian, at** and he will provide the credit card details.

THANK YOU!
**Eric Parkinson, C.E.O.**
**Hannover House & Affiliated Studios**
**Medallion Releasing, Inc. / Bookworks, Inc.**
300 N. College Ave., Suite 311
Fayetteville, AR  72701 / Tel 479-521-5770

From: Eric Parkinson
To: ; fredshefte1
Sent: Mon, Oct 29, 2018 1:38 pm
Subject: Fred's call just now with LINDSEY

Dan - Fred just got off the phone with Lindsey.

She has confirmed the following:

1).   17,000 units (of 22,000) are READY NOW.

2).   They are now REQUIRING that the BALANCE of this new order be paid.  It is ESTIMATED at $5,500... and they WILL Take Amex.

3).   They WILL release ten cases of 100 units for FEDEX OVER NIGHT from labels that HHSE will supply.

FINANCIALLY - if you are able to arrange for a CREDIT CARD for this $5,500 - we will PAY back your party from the proceeds in process from our Michael Kahn stock venture.  It will take about one week.

SHIPMENT WISE - We are awaiting word from SONY / RANDOM / AEC.  But it appears that the HOT HOT need is for 15,000 - of which 1,000 will be arriving TOMORROW.  That means that we COULD split up the SHIPMENT to one level of 14,000 that goes AIR or super FAST (read: EXPENSIVE)... and the balance of 7,000 Units could go via a three or four-day methodology.

Please advise...

**Eric Parkinson, C.E.O.**
**Hannover House & Affiliated Studios**
**Medallion Releasing, Inc. / Bookworks, Inc.**
300 N. College Ave., Suite 311
Fayetteville, AR  72701 / Tel 479-521-5770 

---

**Daniel Roebuck**
To:Eric Parkinson,Eric Parkinson,Fred Shefte,Fred
Cc:Sam Edwards,Daniel Roebuck,Mick Trombley,Mike Molewski
Oct 29, 2018 at 9:10 PM

This email is to memorialize the fact that I personally paid 5978.00 dollars to Signature media on behalf of Hannover House.

As per Eric's earlier email I expect this amount to paid back in full, to me directly, by next week.

If payment is not paid by November 9th I will expect the interest as well.

Please acknowledge this understanding and these terms.

Many Thanks,
Danny

---

**Ripal Patel**
To:Daniel Roebuck,Fred Shefte
Cc:Ron Lehman,Hannover House,LAX Domestic

Oct 29, 2018 at 10:30 PM

Thanks Daniel, CC Card Auth attached please fill out and send back ($5650.50)

Kind Regards,

| We Make It Happen One Shipment at a Time!® | Ripal (Randy) Patel<br>LAX Domestic Dept<br><br>(310) 787-6960 - local<br>(800) 847-4928 - toll-free<br>(310) 787-6980 - fax<br>**AERONET.COM** |
| --- | --- |

---

From: Daniel Roebuck
To: Eric Parkinson ; Fred Shefte ; Eric Parkinson ; Fred
Cc: Mick Trombley ; Sam Edwards ; Daniel Roebuck ; Mike Molewski
Sent: Tue, Oct 30, 2018 11:12 am
Subject: Roebuck monies total
All, Again to memorialize events of the past 24 hours...

I have had to place a total amount of $11,628.00 on my PERSONAL Credit card, otherwise we would have missed our deadline with Walmart .

Please acknowledge here that this money is DUE ME IMMEDIATELY, however I understand that I will receive it no later than November 13 in full. On day after the 13th and you will also pay interest on the debt.

Thank you,
Danny



Eric Parkinson
To:
Cc:

Oct 30, 2018 at 4:37 PM

Understood and agreed...  we are closing the corp. finance portion to cover this now...

**Eric Parkinson, C.E.O.**
**Hannover House & Affiliated Studios**
**Medallion Releasing, Inc. / Bookworks, Inc.**
300 N. College Ave., Suite 311
Fayetteville, AR  72701 / Tel 479-521-5770 ████████████

---



From: Daniel Roebuck ◄████████████████████
To: Fred Shefte ◄████████████████ Fred ████████████████; Eric Parkinson
████████████████; Eric Parkinson ◄███@████████████
Cc: Sam Edwards ◄████████████████; Mick Trombley ◄████@█████████ Mike
Molewski ◄████████████████████; Daniel Roebuck ◄████████████████
Sent: Tue, Nov 13, 2018 9:12 am
Subject: Wiring instructions for Danny attached DUE TODAY

Good Morning Eric and Fred,

This is the due date of your debt to me, personally. Please
wire the money as per instructions below.

NOTE: The Bank is NOW Citizen's Bank. All other
information is the same.

Please acknowledge that you have sent this
amount ($11,628.00) memorialized in the following email
exchange.

"I have had to place a total amount of $11,628.00 on my
PERSONAL Credit card, otherwise we would have missed
our deadline with Walmart .

Please acknowledge here that this money is DUE ME
IMMEDIATELY, however I understand that I will receive it

no later than November 13 in full. On day after the 13th and you will also pay interest on the debt."

Thank you in advance for your prompt actions and timely reply to this email.

One last reminder. It is NOW Citizen's Bank.

Thanks,
Danny

---



**Eric Parkinson**
To:
Cc:

Nov. 13, 2018 at 8:48 PM

Hi Dan - I know that Fred is working with Kutak Rock to get the Rule 144 Exemption letter released - which is what triggers the cash for replication that we discussed. The good news is that it's in motion... the bad news is that it's lilkely to take a few more days as there are two wire transfers that happen before HHSE flips out the replication reimbursement to you. So if it's AMEX (due on the 27th - at least mine is), there is no concern about being late at this time (with them, at least).

Thanks,

**Eric Parkinson, C.E.O.**
**Hannover House & Affiliated Studios**
**Medallion Releasing, Inc. / Bookworks, Inc.**
300 N. College Ave., Suite 311
Fayetteville, AR  72701 / Tel 479-521-5770

# EXHIBIT C



**FLORIO
PERRUCCI
STEINHARDT &
CAPPELLI LLC**

60 West Broad St., Suite 102    o 610.691.7900
Bethlehem, PA 18018             F 610.691.0841

Robert M. Donchez | Partner
610.691.7900 x 1117
rdonchez@floriolaw.com

*January 11, 2019*

<u>Via Certified Mail, Regular Mail & Email</u>
Hannover House, Inc. and Medallion Releasing, Inc.
Attn: Eric F. Parkinson, CEO
300 N. College Ave., Suite 311
Fayetteville, AR 72701

Re:    Notice of Default Pursuant to: (1) the Memorandum of Agreement dated
       December 18, 2017 Between Getting Grace, LLC and Hannover House, Inc.
       and Medallion Releasing, Inc.; (2) Promissory Note Dated December 30, 2017
       In the Amount of $200,000.00; and (3) Promissory Note Dated December 30,
       <u>2017 in the Amount of $450,000.00</u>

Dear Mr. Parkinson:

        Please be advised that this Firm serves as counsel to Getting Grace, LLC (hereinafter "<u>GG</u>")
with regard to the Memorandum of Agreement (the "<u>Agreement</u>") dated December 18, 2017 between
Hannover House, Inc. (hereinafter "<u>Hannover</u>") and Medallion Releasing, Inc. (hereinafter
"<u>Medallion</u>" and together with Hannover, the "<u>Distributor</u>"). Pursuant to the Agreement, Distributor
executed two Promissory Notes each dated December 30, 2017 in the amounts of Two Hundred
Thousand Dollars ($200,000.00) (the "<u>P&A Note</u>") and Four Hundred Fifty Thousand Dollars
($450,000.00) (the "<u>Minimum Guarantee Note</u>" and together with the P&A Note, the "<u>Notes</u>"). As
set forth more fully below, this correspondence shall serve as formal notice that Distributor is in
default under the Agreement and Notes and demand that Distributor immediately pay to GG all
outstanding principal and interest on the Notes within 10 days from the date of this correspondence.

        As you may know, GG is the owner and/or copyright proprietors of a feature film entitled
Getting Grace. Pursuant to the terms of the Agreement, GG contracted with Distributor to distribute
the film. Notably, as a material term of the Agreement, Distributor executed the Notes which, in the
aggregate, had initial principal amounts of Six Hundred Fifty Thousand Dollars ($650,000.00). The
Notes are each subject to seven percent (7%) interest per annum and expressly allow for the recovery
of attorneys' fees and collection costs. Both Notes matured on December 30, 2018. The P&A Note
also required, in addition to repayment of the principal balance with interest, payment of a Sixteen
Thousand Dollar ($16,000.00) Investment Advisory Fee. To date, Distributor has failed to make the
payments due under the Agreement and Notes and, as a result, is in material breach of the Agreement
and the Notes.

Accordingly, this correspondence serves as a formal notice of default pursuant to Section 14 of the Agreement, Section 10 of the P&A Note and Section 9 of the Minimum Guarantee Note. In the event payment of all amounts due and owing to GG are not received within 10 days of your receipt of this notice, GG will pursue any and all remedies under the Agreement, the Notes and/or which exist at law or equity. This may include, without limitation, (i) terminating the Agreement, (ii) declaring all amounts due and owing together with interest, attorneys' fees and costs; (iii) commencing litigation for damages; and/or the entry of a consent judgment as permitted the Notes.

As a result of the default by Distributor and the likelihood of further legal proceedings, this correspondence shall serve as formal notice to Distributor, its employees, officers, directors, and agents that all potentially relevant evidence related to this matter must be preserved including, without limitation, documents, records, correspondence (including but not limited to email correspondence), photographs, videotapes and data (including electronic data). Such preservation efforts should not only include the retention of existing evidence, but should also include the suspension of any deletion, overwriting, or any other possible manner of periodic or scheduled elimination of information, data or records. The destruction or loss of evidence, even if done unintentionally, could subject the Distributor to potential civil penalties, claims for spoliation, sanctions and further claims for monetary damages. Thus, it is vitally important that all evidence be preserved going forward.

This correspondence is sent without prejudice to any rights or remedies of GG, which are expressly reserved. Please be guided accordingly.

Very truly yours,

FLORIO PERRUCCI STEINHARDT & CAPPELLI LLC

Robert M Donchez

RMD/rt

cc:      Getting Grace, LLC

# EXHIBIT D



**FLORIO
PERRUCCI
STEINHARDT &
CAPPELLI LLC**

60 West Broad St., Suite 102   o 610.691.7900
Bethlehem, PA 18018   f 610.691.0841

**Robert M. Donchez** | Partner
610.691.7900 x 1117
rdonchez@floriolaw.com

_____

January 25, 2019

<u>Via Certified Mail, Regular Mail & Email</u>
Hannover House, Inc. and Medallion Releasing, Inc.
Attn: Eric F. Parkinson, CEO
300 N. College Avenue, Suite 311
Fayetteville, AR 72701
~~_____~~

RE:   Notice of Default Pursuant to: (1) the Memorandum of Agreement dated
December 18, 2017 Between Getting Grace, LLC and Hannover House, Inc.
And Medallion Releasing, Inc.; (2) Promissory Note Dated December 30, 2017
In the Amount of $200,000.00; and (3) Promissory Note Dated December 30,
<u>2017 in the Amount of $450,000.00</u>

Dear Mr. Parkinson:

As you are aware, this Firm represents Getting Grace, LLC. Previously, by way of correspondence
dated January 11, 2019, this Firm served a formal Notice of Default upon Hannover House, Inc. and
Medallion Releasing, Inc. with regard to the above-referenced Agreement and Promissory Notes. A copy
of the January 11, 2019 correspondence is enclosed. To date, no response has been received and both
Hannover House, Inc. and Medallion Releasing, Inc. remain in default.

Please be advised that, in accordance with the Agreement and Promissory Notes, this Firm has filed
UCC Liens against Hannover House, Inc. and Medallion Releasing, Inc. A copy of the UCC Liens are
enclosed. In addition, Getting Grace, LLC intends to vigorously pursue any and all remedies available
pursuant to the Agreement, the Promissory Notes and/or which exist at law or equity unless and until full
payment is made.

This correspondence is sent without prejudice to any rights or remedies of Getting Grace, LLC,
which are expressly reserved. Please be guided accordingly.

_FLORIO PERRUCCI STEINHARDT_
_& CAPPELLI, LLC_

Robert M. Donchez, Esquire

RMD/mk
Enclosures
cc: Getting Grace, LLC (w/enc.)
nj Rochelle Park | Phillipsburg | Cherry Hill   pa Bethlehem | Harrisburg   ny New York City   www.floriolaw.com



**FLORIO
PERRUCCI
STEINHARDT &
CAPPELLI LLC**

60 West Broad St., Suite 102     o 610.691.7900
Bethlehem, PA 18018              F 610.691.0841

Robert M. Donchez | Partner
610.691.7900 x 1117
rdonchez@floriolaw.com

*January 11, 2019*

<u>Via Certified Mail, Regular Mail & Email</u>
Hannover House, Inc. and Medallion Releasing, Inc.
Attn: Eric F. Parkinson, CEO
300 N. College Ave., Suite 311
Fayetteville, AR 72701

Re:   Notice of Default Pursuant to: (1) the Memorandum of Agreement dated
      December 18, 2017 Between Getting Grace, LLC and Hannover House, Inc.
      and Medallion Releasing, Inc.; (2) Promissory Note Dated December 30, 2017
      In the Amount of $200,000.00; and (3) Promissory Note Dated December 30,
      2017 in the Amount of $450,000.00

Dear Mr. Parkinson:

Please be advised that this Firm serves as counsel to Getting Grace, LLC (hereinafter "GG")
with regard to the Memorandum of Agreement (the "Agreement") dated December 18, 2017 between
Hannover House, Inc. (hereinafter "Hannover") and Medallion Releasing, Inc. (hereinafter
"Medallion" and together with Hannover, the "Distributor"). Pursuant to the Agreement, Distributor
executed two Promissory Notes each dated December 30, 2017 in the amounts of Two Hundred
Thousand Dollars ($200,000.00) (the "P&A Note") and Four Hundred Fifty Thousand Dollars
($450,000.00) (the "Minimum Guarantee Note" and together with the P&A Note, the "Notes"). As
set forth more fully below, this correspondence shall serve as formal notice that Distributor is in
default under the Agreement and Notes and demand that Distributor immediately pay to GG all
outstanding principal and interest on the Notes within 10 days from the date of this correspondence.

As you may know, GG is the owner and/or copyright proprietors of a feature film entitled
Getting Grace. Pursuant to the terms of the Agreement, GG contracted with Distributor to distribute
the film. Notably, as a material term of the Agreement, Distributor executed the Notes which, in the
aggregate, had initial principal amounts of Six Hundred Fifty Thousand Dollars ($650,000.00). The
Notes are each subject to seven percent (7%) interest per annum and expressly allow for the recovery
of attorneys' fees and collection costs. Both Notes matured on December 30, 2018. The P&A Note
also required, in addition to repayment of the principal balance with interest, payment of a Sixteen
Thousand Dollar ($16,000.00) Investment Advisory Fee. To date, Distributor has failed to make the
payments due under the Agreement and Notes and, as a result, is in material breach of the Agreement
and the Notes.

NJ Rochelle Park     Phillipsburg · Cherry Hill     PA Bethlehem | Harrisburg     NY New York City          www.floriolaw.com

Accordingly, this correspondence serves as a formal notice of default pursuant to Section 14 of the Agreement, Section 10 of the P&A Note and Section 9 of the Minimum Guarantee Note.  In the event payment of all amounts due and owing to GG are not received within 10 days of your receipt of this notice, GG will pursue any and all remedies under the Agreement, the Notes and/or which exist at law or equity.  This may include, without limitation, (i) terminating the Agreement, (ii) declaring all amounts due and owing together with interest, attorneys' fees and costs; (iii) commencing litigation for damages; and/or the entry of a consent judgment as permitted the Notes.

As a result of the default by Distributor and the likelihood of further legal proceedings, this correspondence shall serve as formal notice to Distributor, its employees, officers, directors, and agents that all potentially relevant evidence related to this matter must be preserved including, without limitation, documents, records, correspondence (including but not limited to email correspondence), photographs, videotapes and data (including electronic data).  Such preservation efforts should not only include the retention of existing evidence, but should also include the suspension of any deletion, overwriting, or any other possible manner of periodic or scheduled elimination of information, data or records.  The destruction or loss of evidence, even if done unintentionally, could subject the Distributor to potential civil penalties, claims for spoliation, sanctions and further claims for monetary damages.  Thus, it is vitally important that all evidence be preserved going forward.

This correspondence is sent without prejudice to any rights or remedies of GG, which are expressly reserved.  Please be guided accordingly.

Very truly yours,

FLORIO PERRUCCI STEINHARDT & CAPPELLI LLC

Robert M Donchez

RMD/rt

cc:     Getting Grace, LLC

## Arkansas Secretary of State

State Capitol / Little Rock, AR 72201 / 501.682.5078

## UCC ONLINE FILING

### UCC - New Filing

| | |
|---|---|
| Filing Number: | 40000181475595 |
| Filing Time: | 1/25/2019 03:18 PM |
| Expiration Date: | 1/25/2024 12:00 AM |
| Reference Number: | 77777.0001 |
| Optional Filer Reference Data: | GETTING GRACE LLC |

---

### Debtor (1)

| | |
|---|---|
| Company Name: | MEDALLION RELEASING, INC. |
| Mailing Address: | 1428 CHESTER STREET |
| City: | SPRINGDALENGDALE |
| State: | AR |
| Zip Code: | 72764 |
| Country: | USA |

---

### Secured Party (3)

| | |
|---|---|
| Company Name: | GETTING GRACE, LLC |
| Mailing Address: | 912 SOUTH ATHERTON STREET |
| City: | STATE COLLEGE |
| State: | PA |
| Zip Code: | 16801 |
| Country: | USA |

---

| | |
|---|---|
| Description of Collateral: | ANY AND ALL ASSETS OF BORROWER INCLUDING ALL PERSONAL PROPERTY OF BORROWER, INCLUDING THE FOLLOWING, ALL WHETHER NOW OWNED OR HEREAFTER ACQUIRED OR ARISING: (I) ACCOUNTS (INCLUDING CREDIT CARD RECEIVABLES); (II) SECURITIES ENTITLEMENTS, SECURITIES ACCOUNTS, COMMODITY ACCOUNTS, COMMODITY CONTRACTS AND INVESTMENT PROPERTY: (III) DEPOSIT AND ESCROW ACCOUNTS; (IV) |

INSTRUMENTS (INCLUDING PROMISSORY NOTES); (V) DOCUMENTS (INCLUDING WAREHOUSE RECEIPTS); (VI) CHATTEL PAPER (INCLUDING ELECTRONIC CHATTEL PAPER AND TANGIBLE CHATTEL PAPER); (VII) INVENTORY, INCLUDING RAW MATERIALS, WORK IN PROCESS AND FINISHED GOODS; (VIII) GOODS OF EVERY NATURE, INCLUDING STOCK-IN-TRADE, GOODS ON CONSIGNMENT, COMPUTER PROGRAMS EMBEDDED IN SUCH GOODS; (IX) MACHINERY AND EQUIPMENT; (X) FURNITURE AND FIXTURES; (XI) COMMERCIAL TORT CLAIMS, IF ANY; (XII) LETTER OF CREDIT RIGHTS; (XIII) GENERAL INTANGIBLES, OF EVERY KIND AND DESCRIPTION, INCLUDING PAYMENT INTANGIBLES, SOFTWARE, COMPUTER INFORMATION, SOURCE CODES, OBJECT CODES, RECORDS AND DATA, ALL EXISTING AND FUTURE CUSTOMER LISTS, CHOSES IN ACTION, CLAIMS (INCLUDING CLAIMS FOR INDEMNIFICATION OR BREACH OF WARRANTY), BOOKS, RECORDS, PATENTS AND PATENTS APPLICATIONS, COPYRIGHTS, TRADEMARKS, TRADENAMES, TRADESTYLES, TRADEMARK APPLICATIONS, GOODWILL, BLUEPRINTS, DRAWINGS, DESIGNS AND PLANS, PERMITS AND GOVERNMENTAL APPROVALS, TRADE SECRETS, CONTRACTS, LICENSES, LICENSE AGREEMENTS, MANAGEMENT AGREEMENTS, FRANCHISE AGREEMENTS, UTILITY AGREEMENTS AND DEPOSITS, BUILDING SERVICE CONTRACTS, CONSTRUCTION CONTRACTS, AND ARCHITECTÃ¢ï¿½ï¿½S AGREEMENTS; (XIV) TAX AND ANY OTHER TYPES OF REFUNDS, RETURNED AND UNEARNED INSURANCE PREMIUMS, RIGHTS AND CLAIMS UNDER INSURANCE POLICIES; (XV) ALL SUPPORTING OBLIGATIONS OF ALL THE FOREGOING PROPERTY; (XVI) ALL PROPERTY OF THE BORROWER NOW OR HEREAFTER IN THE LENDERÃ¢ï¿½ï¿½S POSSESSION OR IN TRANSIT TO OR FROM, OR UNDER THE CUSTODY OR CONTROL OF, THE LENDER OR ANY AFFILIATE THEREOF, INCLUDING FIXTURES AND INVENTORY; (XVII) ALL CASH AND CASH EQUIVALENTS THEREOF; (XVIII) ALL CASH AND NON-CASH PROCEEDS (INCLUDING INSURANCE PROCEEDS) OF ALL OF THE FOREGOING PROPERTY, ALL PRODUCTS THEREOF AND ALL ADDITIONS AND ACCESSIONS THERETO, SUBSTITUTIONS THEREFOR AND REPLACEMENTS THEREOF.

---

Alternative Designation (if applicable):

Lessee/Lessor

Consignee/Consignor

Bailee/Bailor

Seller/Buyer

Licensee/Licensor

---

This FINANCING STATEMENT is to be filed [for record](or recorded) in the REAL ESTATE RECORDS.

This FINANCING STATEMENT covers:

    timber to be cut

    as-extracted collateral

    is filed as a fixture filing.

        Description of Real
        Estate:

        Name and address of a
        RECORD OWNER of
        above-described real
        estate (if Debtor does not
        have a record interest):

Collateral is:

    held in a trust

    being administered by a Decedent's Personal Representative

X   Not Applicable

    Ag. Lien

    Non-UCC Filing

X   Not Applicable

    Debtor is a Transmitting Utility

    Filed in connection with a Manufactured-Home Transaction - effective 30 years.

    Filed in connection with a Public-Finance Transaction - effective 30 years.

    Claim Holder, Lien Holder, or Judgment Creditor

    Company Name:  GETTING GRACE, LLC

    Mailing Address: 912 SOUTH ATHERTON STREET

    City:          STATE COLLEGE

    State:         PA

    Zip Code:     16801

    telephone:   

    Entity Authorized to Release this Filing

    Name:        MICHAEL TROMBLEY

    Title:         AUTHORIZED INDIVIDUAL

    Successor to Entity Authorized to Release this Filing

    Name:

Title:

# Arkansas Secretary of State

State Capitol / Little Rock, AR 72201 / 501.682.5078

## UCC ONLINE FILING

### UCC - New Filing

| | |
|---|---|
| Filing Number: | 40000181473715 |
| Filing Time: | 1/25/2019 03:00 PM |
| Expiration Date: | 1/25/2024 12:00 AM |
| Reference Number: | 77777.0001 |
| Optional Filer Reference Data: | GETTING GRACE LLC |

---

Debtor (1)

| | |
|---|---|
| Company Name: | HANNOVER HOUSE, INC. |
| Mailing Address: | 1 W. CENTER STREET |
| City: | FAYETTEVILLE |
| State: | AR |
| Zip Code: | 72701 |
| Country: | USA |

---

Secured Party (3)

| | |
|---|---|
| Company Name: | GETTING GRACE, LLC |
| Mailing Address: | 912 SOUTH ATHERTON STREET |
| City: | STATE COLLEGE |
| State: | PA |
| Zip Code: | 16801 |
| Country: | USA |

---

| Description of Collateral: | ANY AND ALL ASSETS OF BORROWER INCLUDING ALL PERSONAL PROPERTY OF BORROWER, INCLUDING THE FOLLOWING, ALL WHETHER NOW OWNED OR HEREAFTER ACQUIRED OR ARISING: (I) ACCOUNTS (INCLUDING CREDIT CARD RECEIVABLES); (II) SECURITIES ENTITLEMENTS, SECURITIES ACCOUNTS, COMMODITY ACCOUNTS, COMMODITY CONTRACTS AND INVESTMENT PROPERTY: (III) DEPOSIT AND ESCROW ACCOUNTS; (IV) |
|---|---|

INSTRUMENTS (INCLUDING PROMISSORY NOTES); (V) DOCUMENTS
(INCLUDING WAREHOUSE RECEIPTS); (VI) CHATTEL PAPER
(INCLUDING ELECTRONIC CHATTEL PAPER AND TANGIBLE
CHATTEL PAPER); (VII) INVENTORY, INCLUDING RAW MATERIALS,
WORK IN PROCESS AND FINISHED GOODS; (VIII) GOODS OF EVERY
NATURE, INCLUDING STOCK-IN-TRADE, GOODS ON CONSIGNMENT,
COMPUTER PROGRAMS EMBEDDED IN SUCH GOODS; (IX)
MACHINERY AND EQUIPMENT; (X) FURNITURE AND FIXTURES; (XI)
COMMERCIAL TORT CLAIMS, IF ANY; (XII) LETTER OF CREDIT
RIGHTS; (XIII) GENERAL INTANGIBLES, OF EVERY KIND AND
DESCRIPTION, INCLUDING PAYMENT INTANGIBLES, SOFTWARE,
COMPUTER INFORMATION, SOURCE CODES, OBJECT CODES,
RECORDS AND DATA, ALL EXISTING AND FUTURE CUSTOMER
LISTS, CHOSES IN ACTION, CLAIMS (INCLUDING CLAIMS FOR
INDEMNIFICATION OR BREACH OF WARRANTY), BOOKS, RECORDS,
PATENTS AND PATENTS APPLICATIONS, COPYRIGHTS,
TRADEMARKS, TRADENAMES, TRADESTYLES, TRADEMARK
APPLICATIONS, GOODWILL, BLUEPRINTS, DRAWINGS, DESIGNS
AND PLANS, PERMITS AND GOVERNMENTAL APPROVALS, TRADE
SECRETS, CONTRACTS, LICENSES, LICENSE AGREEMENTS,
MANAGEMENT AGREEMENTS, FRANCHISE AGREEMENTS, UTILITY
AGREEMENTS AND DEPOSITS, BUILDING SERVICE CONTRACTS,
CONSTRUCTION CONTRACTS, AND ARCHITECTâ€™S
AGREEMENTS; (XIV) TAX AND ANY OTHER TYPES OF REFUNDS,
RETURNED AND UNEARNED INSURANCE PREMIUMS, RIGHTS AND
CLAIMS UNDER INSURANCE POLICIES; (XV) ALL SUPPORTING
OBLIGATIONS OF ALL THE FOREGOING PROPERTY; (XVI) ALL
PROPERTY OF THE BORROWER NOW OR HEREAFTER IN THE
LENDERâ€™S POSSESSION OR IN TRANSIT TO OR FROM, OR UNDER
THE CUSTODY OR CONTROL OF, THE LENDER OR ANY AFFILIATE
THEREOF, INCLUDING FIXTURES AND INVENTORY; (XVII) ALL
CASH AND CASH EQUIVALENTS THEREOF; (XVIII) ALL CASH AND
NON-CASH PROCEEDS (INCLUDING INSURANCE PROCEEDS) OF ALL
OF THE FOREGOING PROPERTY, ALL PRODUCTS THEREOF AND
ALL ADDITIONS AND ACCESSIONS THERETO, SUBSTITUTIONS
THEREFOR AND REPLACEMENTS THEREOF.

---

Alternative Designation (if applicable):

Lessee/Lessor

Consignee/Consignor

Bailee/Bailor

Seller/Buyer

Licensee/Licensor

---

This FINANCING STATEMENT is to be filed [for record](or recorded) in the REAL
ESTATE RECORDS.

This FINANCING STATEMENT covers:

timber to be cut

as-extracted collateral

is filed as a fixture filing.

Description of Real
Estate:

Name and address of a
RECORD OWNER of
above-described real
estate (if Debtor does not
have a record interest):

Collateral is:

held in a trust

being administered by a Decedent's Personal Representative

X   Not Applicable

Ag. Lien

Non-UCC Filing

X   Not Applicable

Debtor is a Transmitting Utility

Filed in connection with a Manufactured-Home Transaction - effective 30 years.

Filed in connection with a Public-Finance Transaction - effective 30 years.

Claim Holder, Lien Holder, or Judgment Creditor

Company Name:  GETTING GRACE, LLC

Mailing Address: 912 SOUTH ATHERTON STREET

City:              STATE COLLEGE

State:             PA

Zip Code:   .    16801

telephone:    ▓▓▓▓▓▓▓▓

Entity Authorized to Release this Filing

Name:        MICHAEL TROMBLEY

Title:          AUTHORIZED INDIVIDUAL

Successor to Entity Authorized to Release this Filing

Name:

Title:

# EXHIBIT E

5/2/2019                                                  EDGAR Search Results



Home | Latest Filings | Previous Page



**U.S. Securities and Exchange Commission**

# EDGAR Search Results

SEC Home » Search the Next-Generation EDGAR System » Company Search » *Current Page*

## Hannover House, Inc. CIK#: 0001069680 (see all company filings)

SIC: 7812 - SERVICES-MOTION PICTURE & VIDEO TAPE PRODUCTION
State location: AR | State of Inc.: **WY** | Fiscal Year End: 1231
formerly: ECKLAN CORP (filings through 2001-02-07)
formerly: MINDSET INTERACTIVE CORP (filings through 2013-11-20)
(Assistant Director Office: 5)
Get **insider transactions** for this **issuer**.

| | Business Address | Mailing Address |
|---|---|---|
| | 1428 CHESTER ST. | 1428 CHESTER ST. |
| | SPRINGDALE AR 72764 | SPRINGDALE AR 72764 |
| | 479-751-4500 | |

Filter Results: | Filing Type: | Prior to: (YYYYMMDD) | Ownership? ○ include ● exclude ○ only | Limit Results Per Page 40 Entries ▼ | Search / Show All |

Items 1 - 40 📶 RSS Feed                                                                    Next 40

| Filings | Format | Description | Filing Date | File/Film Number |
|---|---|---|---|---|
| 10-Q | Documents | Quarterly report [Sections 13 or 15(d)] Acc-no: 0001471242-15-000085 (34 Act)  Size: 1 MB | 2015-12-03 | 000-28723 151265928 |
| 8-K | Documents | Current report, item 8.01 Acc-no: 0001471242-15-000082 (34 Act)  Size: 23 KB | 2015-11-24 | 000-28723 151253402 |
| 8-K | Documents | Current report, item 8.01 Acc-no: 0001471242-15-000077 (34 Act)  Size: 16 KB | 2015-09-28 | 000-28723 151128296 |
| 8-K | Documents | Current report, items 1.01, 2.01, 2.02, and 9.01 Acc-no: 0001471242-15-000075 (34 Act)  Size: 239 KB | 2015-09-14 | 000-28723 151104921 |
| 10-Q | Documents | Quarterly report [Sections 13 or 15(d)] Acc-no: 0001471242-15-000073 (34 Act)  Size: 1 MB | 2015-09-10 | 000-28723 151101395 |
| RW | Documents | Registration Withdrawal Request Acc-no: 0001471242-15-000052 (NE Act)  Size: 7 KB | 2015-05-08 | 000-28723 15847918 |
| NT 10-K | Documents | Notification of inability to timely file Form 10-K 405, 10-K, 10-KSB 405, 10-KSB, 10-KT, or 10-KT405 Acc-no: 0001471242-15-000044 (34 Act)  Size: 14 KB | 2015-03-31 | 000-28723 15740494 |
| 10-12G | Documents | Registration of securities [Section 12(g)] Acc-no: 0001471242-15-000032 (34 Act)  Size: 17 MB | 2015-03-11 | 000-28723 15691960 |
| 8-K | Documents | Current report, items 1.01, 5.02, 5.03, and 8.01 Acc-no: 0001471242-14-000423 (34 Act)  Size: 24 KB | 2014-12-16 | 000-28723 141289299 |
| 8-K | Documents | Current report, items 1.01 and 1.02 Acc-no: 0001471242-14-000349 (34 Act)  Size: 35 KB | 2014-09-16 | 000-28723 141104628 |
| 10-Q | Documents | Quarterly report [Sections 13 or 15(d)] Acc-no: 0001471242-14-000317 (34 Act)  Size: 435 KB | 2014-08-19 | 000-28723 141050671 |
| 8-K | Documents | Current report, item 1.01 Acc-no: 0001471242-14-000303 (34 Act)  Size: 75 KB | 2014-08-14 | 000-28723 141041273 |
| 10-Q | Documents | Quarterly report [Sections 13 or 15(d)] Acc-no: 0001471242-14-000206 (34 Act)  Size: 193 KB | 2014-05-15 | 000-28723 14848008 |
| 8-K | Documents | Current report, item 1.01 Acc-no: 0001471242-14-000189 (34 Act)  Size: 19 KB | 2014-05-12 | 000-28723 14832135 |
| 8-K | Documents | Current report, items 1.01, 1.02, 5.03, and 8.01 Acc-no: 0001471242-14-000116 (34 Act)  Size: 23 KB | 2014-03-28 | 000-28723 14726764 |
| 10-Q | Documents | Quarterly report [Sections 13 or 15(d)] Acc-no: 0001471242-14-000060 (34 Act)  Size: 181 KB | 2014-02-19 | 000-28723 14624589 |

EDGAR Search Results

| 8-K | Documents | Current report, items 1.01 and 2.02<br>Acc-no: 0001471242-14-000052 (34 Act)  Size: 119 KB | 2014-02-11 | 000-28723<br>14594967 |
|-----|-----------|---|---|---|
| 8-K | Documents | Current report, items 1.01 and 1.02<br>Acc-no: 0001471242-14-000036 (34 Act)  Size: 38 KB | 2014-01-17 | 000-28723<br>14533812 |
| 8-K | Documents | Current report, item 1.02<br>Acc-no: 0001471242-14-000023 (34 Act)  Size: 35 KB | 2014-01-09 | 000-28723<br>14517994 |
| 8-K | Documents | Current report, items 2.02, 3.03, 5.02, 5.03, 8.01, and 9.01<br>Acc-no: 0001471242-13-000402 (34 Act)  Size: 115 KB | 2013-11-20 | 000-28723<br>131232621 |
| 15-12G | Documents | Securities registration termination [Section 12(g)]<br>Acc-no: 0001019687-05-002231 (34 Act)  Size: 4 KB | 2005-08-15 | 000-28723<br>051024787 |
| 8-K | Documents | Current report, items 4 and 7<br>Acc-no: 0000945234-03-000100 Size: 6 KB | 2003-03-06 | 000-28723<br>03593973 |
| SC 13G | Documents | Statement of acquisition of beneficial ownership by individuals<br>Acc-no: 0001019687-03-000073 Size: 16 KB | 2003-01-17 | 005-78684<br>03517376 |
| SC 13G | Documents | Statement of acquisition of beneficial ownership by individuals<br>Acc-no: 0001019687-03-000071 Size: 15 KB | 2003-01-17 | 005-78684<br>03517370 |
| SC 13G | Documents | Statement of acquisition of beneficial ownership by individuals<br>Acc-no: 0001019687-03-000070 Size: 13 KB | 2003-01-17 | 005-78684<br>03517368 |
| NT 10-Q | Documents | Notification of inability to timely file Form 10-Q or 10-QSB<br>Acc-no: 0001019687-02-002188 Size: 8 KB | 2002-11-15 | 000-28723<br>02828535 |
| 10QSB | Documents | Optional form for quarterly and transition reports of small business issuers<br>Acc-no: 0001019687-02-002189 Size: 36 KB | 2002-11-14 | 000-28723<br>02828539 |
| 10QSB | Documents | Optional form for quarterly and transition reports of small business issuers<br>Acc-no: 0001019687-02-001651 Size: 26 KB | 2002-08-19 | 000-28723<br>02743116 |
| NT 10-Q | Documents | Notification of inability to timely file Form 10-Q or 10-QSB<br>Acc-no: 0001019687-02-001566 Size: 8 KB | 2002-08-15 | 000-28723<br>02739569 |
| DEF 14C | Documents | Other definitive information statements<br>Acc-no: 0001019687-02-001097 Size: 71 KB | 2002-05-30 | 000-28723<br>02665840 |
| PRER14C | Documents | Information statements<br>Acc-no: 0001019687-02-001096 Size: 71 KB | 2002-05-30 | 000-28723<br>02665735 |
| 10QSB | Documents | Optional form for quarterly and transition reports of small business issuers<br>Acc-no: 0001019687-02-001063 Size: 39 KB | 2002-05-22 | 000-28723<br>02659810 |
| PRE 14C | Documents | Other preliminary information statements<br>Acc-no: 0001019687-02-001005 Size: 57 KB | 2002-05-16 | 000-28723<br>02654791 |
| NT 10-Q | Documents | Notification of inability to timely file Form 10-Q or 10-QSB<br>Acc-no: 0001019687-02-000911 Size: 8 KB | 2002-05-14 | 000-28723<br>02647433 |
| 10KSB/A | Documents | [Amend] Optional form for annual and transition reports of small business issuers [Section 13 or 15(d), not S-B Item 405]<br>Acc-no: 0001019687-02-000716 Size: 14 KB | 2002-04-29 | 000-28723<br>02625403 |
| 10KSB | Documents | Optional form for annual and transition reports of small business issuers [Section 13 or 15(d), not S-B Item 405]<br>Acc-no: 0001019687-02-000599 Size: 123 KB | 2002-04-15 | 000-28723<br>02610492 |
| NT 10-K | Documents | Notification of inability to timely file Form 10-K 405, 10-K, 10-KSB 405, 10-KSB, 10-KT, or 10-KT405<br>Acc-no: 0001019687-02-000467 Size: 9 KB | 2002-03-29 | 000-28723<br>02594004 |
| 10QSB | Documents | Optional form for quarterly and transition reports of small business issuers<br>Acc-no: 0001019687-01-501117 Size: 30 KB | 2001-11-14 | 000-28723<br>1789670 |
| 10QSB | Documents | Optional form for quarterly and transition reports of small business issuers<br>Acc-no: 0001104540-01-500217 Size: 49 KB | 2001-08-14 | 000-28723<br>1712986 |
| 10QSB/A | Documents | [Amend] Optional form for quarterly and transition reports of small business issuers<br>Acc-no: 0001104540-01-500193 Size: 22 KB | 2001-06-13 | 000-28723<br>1659832 |

Next 40

*https://www.sec.gov/cgi-bin/browse-edgar*

# EXHIBIT F

**Daniel Roebuck** ◄ ▬▬▬▬▬▬▬▬▬
**To:**Mick Trombley,Sam Edwards,Zach Tran,Mike Molewski
Dec 8, 2017 at 10:06 PM

# From Eric...

As discussed, this document is to be kept under the strictest of confidences, so as to not violate the "proprietary / non-disclosure" agreement between HHSE and SONY that ONLY enables us to show this document to principal corporate advisors and attorneys.  In this respect, I appreciate your insight as a 40-year veteran of the home video and feature film industry - and trust that you will recognize the incredible value this studio output agreement delivers to HHSE and our supplier partners.

AS STATED IN OUR CALL... when we first started speaking about "GETTING GRACE" - we did NOT have this SONY deal readied.  At that time, we were using CINEDIGM as our video wholesale-consolidator... and we were selling NETFLIX and Video-On-Demand sites "directly" as Hannover House.  Frankly, we were not very good at selling V.O.D. on our own... based upon the OUTSTANDING numbers that SONY showed to us.  We were happy to sell NETFLIX for $60,000 and get a 20% ($12,000 fee)... but our jaws dropped when Ben and Ilia showed us that "qualifying theatrical titles" (such as GETTING GRACE) are getting $200,000 from Netflix through SONY - as they have the leverage of mega-hits to force higher fees across the board.

This brought up a dilemma for GETTING GRACE, in that it was not felt to be "fair" to the producers that SONY would earn a 20% fee for Netflix / Video-On-Demand.. AND... Hannover House would earn an ADDITIONAL 20% fee on those same sales.

The dilemma works for both GETTING GRACE and HANNOVER HOUSE.  Let me elaborate.

1).   Hannover House NEEDS to be paid for our services... which INCLUDE the tremendous value of delivering GETTING GRACE to SONY.

2).   Hannover House NEEDS to get "as much money as possible" to PASS THROUGH from all revenue streams to GETTING GRACE, to satisfy the P&A and MG agreements.

3).   GETTING GRACE is probably "pleased" with the credibility and stature of having the film distributed by SONY (through the HHSE output agreement);  but NOT if it means that GETTING GRACE is making LESS MONEY than if HHSE sold the film to Netflix and V.O.D. directly.

In this respect, I spoke with Fred and we have a structure that we feel is FAIR TO BOTH PARTIES with respect to Netflix and V.O.D. sales generated by SONY.

*    SONY will earn their 20% fee on such sales.

*    HHSE will earn a **0% fee** for the first **FORTY-EIGHT-THOUSAND DOLLARS (USD $48,000)** in Netflix and V.O.D. revenues from SONY.  This is because $48,000 is the LIKELY AMOUNT that would have been passed-through to Getting Grace HAD HANNOVER sold Netflix directly *(and not through SONY)*.

*    HHSE will earn an EIGHT PERCENT (8%) fee for all net revenues from Netflix and V.O.D. generated through SONY after this base threshold of $48,000 in payments is met.

The rationale' for this is that Getting Grace is making MORE money under the SONY deal... but it should NOT be at the expense of HHSE participating.  After all, it's taken me 32-years to FINALLY have a Studio Output agreement, and this is EXTREMELY VALUABLE as there are only 8 indie studios with such full service access through the majors.  We earned this coveted position through demonstrating our ability to theatrically release quality, indie films, and to recognize those required elements for commercial success.  So Hannover House is definitely providing a VERY VALUABLE service to GETTING GRACE in enabling the film to be released through SONY... and we feel that 8% "after break-even" levels were met, is a FAIR compromise.

WITH RESPECT TO PHYSICAL DISTRIBUTION (DVD / BluRay), SONY is providing the function as one-stop wholesaler... we would have to use SOMEONE in this role (e.g. our "other" wholesaler is CINEDIGM...

previously we used Anderson Merchandisers, Allegro Music and Alchemy).  So, there's no basis to not pay us our agreed upon distribution fee for the sales of all physical copies of GETTING GRACE.  We like SONY over CINEDIGM for so many reasons, specifically:

1).  SONY controls 4-times more Shelf Space at retail than Cinedigm... meaning that we are in a good position to sell MORE units of each release.

2).  SONY commands a higher wholesale price to Walmart, Target, Best Buy (the Big Three), which is more net monies passing through to HHSE and our suppliers.

3).  SONY has a "returns liquidation formula" that monetizes the hold-backs much faster than Cinedigm;  plus SONY pays each month on the 15th, via bank wire, with no drama to collect.

4).  SONY is credible, financially solvent and provides a respectable "co-label" for all HHSE releases... and in turn, this adds credibility to our producer's films.

In any event, please get back to me with your thoughts and comments.

Best Regards,

**Eric Parkinson, C.E.O.**
**Hannover House & Affiliated Studios**
**Medallion Releasing, Inc. / Bookworks, Inc.**
300 N. College Ave., Suite 311
Fayetteville, AR  72701 / Tel 479-521-5770

-----Original Message-----
From: Schwartz, Vi
To: eric ████████████████, fredshefte1 ███████████
Cc: Means, Ben ███████████████; Beizerman, Ilia ████████████████; Webster, Tamira ████████████
Sent: Mon, Nov 20, 2017 6:33 pm
Subject: Hannover Distribution Agreement

Dear Eric and Fred,

Attached please find a draft of the Distribution Agreement between Hannover House and Sony Pictures Home Entertainment.  Please let us know if you have any questions or comments.  We are happy to schedule a call to discuss them once you've had a chance to review.

Best regards,

Vi

**Vi Schwartz**
**Senior Counsel, Legal Affairs**
**Sony Pictures Entertainment**
10202 West Washington Blvd | Morita 2805 | Culver City, CA 90232
☎ 310.244.8366 | 7 310.244.8883 | ███████████████

**Eric Parkinson** ████████████████

To: ███████████████████████████████████
Mar 19, 2018 at 1:04 AM

Sam – attached are the Financials that were also part of the Agreement.  You will note that we have been tracking costs by "line item" on the BUDGET sheet of this XL.... with a column marked for paid to date, amount remaining to complete and a tracking for over/(under) budget by line item.  I was not tracking the BUS TOUR expenses, except for THEATRE RENTALS, the initial signage, and some DCP masters and freight.

The big items that we are "**over**" budget on are the Trail Mix delivery (Deluxe), the Bus Tour theatre rentals *(mostly Regal)* and the Virtual Print Fees for having more locations.

The big items that we are "**under**" budget on are Giant Banners, a variety of mastering related costs, and my recommendation to AXE the floor displayers and the Ticket Promotions *(savings of $10,750)*.  These last two items will not a measurable impact our theatre traffic... and are "optional" whereas the Bus Tour – *which generated a LOT of buzz, incurred unexpected theatre rental costs* – which I feel were clearly a better use of those funds.

<u>*Hot costs are:*</u>

*   Pay Deluxe DCDC for creating and distributing DCP drives to theatres.

*   Launch Regal Crown Club Member email blast *($6,000 for 4.5-million emails)*.

*   Launch theatre specific FaceBook support *(67 locations confirmed for Friday – not counting 24 standby)*.

This does NOT include the potential that SOME of the 24 "standby" locations will come aboard for 3/23.  It's save to assume that these will result in $850 each for Virtual Print Fee, $15 each for poster shipping and $100 each for FaceBook support (total of $965 per NEW location).

We are sitting on $10k+ which is enough to pay the LAB and START on FaceBook... but not enough to complete FB for the week, or to pay for the Regal Crown Club email campaign... which is why we are hopeful that you are successful in raising the remaining $10k (or getting access to a credit card for any portion thereof).

Thanks ERIC


**Eric Parkinson, C.E.O.**
**Hannover House & Affiliated Studios**
**Medallion Releasing, Inc. / Bookworks, Inc.**
300 N. College Ave., Suite 311
Fayetteville, AR  72701 / Tel 479-521-5770